**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

NATIONWIDE LIFE INSURANCE : 
COMPANY, :
: CIVIL ACTION
Plaintiff, :
:
v. :
: NO. 05-281
COMMONWEALTH LAND TITLE :
INSURANCE COMPANY, :
:
Defendant. :

**MEMORANDUM**

BUCKWALTER, S.J. January 20, 2011

Currently pending before the Court is Plaintiff Nationwide Life Insurance Company's

Motion *in Limine* to Exclude the expert report and testimony of Defendant Commonwealth Land

Title Insurance Company's expert J. Bushnell Nielsen. For the following reasons, the Motion is

granted in part and denied in part.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

This long-pending case arose out of a title insurance policy issued by Defendant

Commonwealth Land Title Insurance Company ("Commonwealth") to Plaintiff Nationwide Life

Insurance Company ("Nationwide"). According to the Complaint,[1] a company by the name of PMI

Associates ("PMI") originally purchased real property from Liberty Mills Limited Partnership

("Liberty Mills") in 1988. (Compl. ¶ 8.) At that time, PMI and Liberty Mills entered into a

Declaration of Restrictions (the "Declaration"), which gave Liberty Mills, in part, the right to refuse

approval of future purchasers of the Property and an option to repurchase the Property in certain

_____

[1] For purposes of this Motion, the Court takes the allegations of the Complaint as true.

circumstances.  (Id. ¶¶ 9-11.)

In 2001, PMI took out a $3.5 million loan from Plaintiff Nationwide using the above property as interest.  (Id. ¶¶ 12-13.)  Nationwide, in turn, purchased a title insurance policy ("Policy") from Defendant Commonwealth, which contained what is known as an America Land Title Association ("ALTA") 9 Endorsement, covering Nationwide, among other things, against loss or damage sustained by reason of:

> Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition, . . . (iv) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

(Id. ¶¶ 14-15.)  PMI eventually defaulted on the balance of its loan in 2003 and, in lieu of foreclosure proceedings, it conveyed the property to Nationwide by fee simple deed.  (Id. ¶ 18.)  In an effort to recoup its losses, Nationwide attempted to sell the property to Ironwood Real Estate, LLC ("Ironwood"), but was thwarted when Liberty Mills's successor-in-interest, Franklin Mills Associates Limited Partnership ("Franklin Mills"), invoked its rights under the Declaration and refused to approve Ironwood as a buyer.  (Id. ¶¶ 20-21.)

Thereafter, Nationwide submitted a claim for coverage to Commonwealth, alleging that Franklin Mills's rights of refusal were covered restrictions that made the property unusable and unsalable.  (Id. ¶¶ 22-24.)  Commonwealth denied the claim on the ground that the Policy expressly excepted coverage for loss resulting from the rights invoked by Franklin Mills.  (Id. ¶ 25.)  In light of its disagreement with such a policy interpretation, Nationwide initiated a lawsuit against Commonwealth in this Court.  Commonwealth moved to dismiss and, on October 19, 2005, the Court dismissed the case finding that, by listing the Declaration under the heading "exceptions from coverage" in Schedule B of the Policy, the Policy "expressly excepted" any loss or damage arising

from the Declaration.  Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co., No. CIV.A.05-281,

2005 WL 276492, at *7 (E.D. Pa. Oct. 19, 2005).  Nationwide subsequently sought reconsideration,

arguing that the Court's plain-language interpretation of the Policy was inconsistent with industry

custom and practice.  The Court, however, rejected that claim and further held that Plaintiff

Nationwide bore the burden of proper diligence before issuing the mortgage to PMI.  Nationwide

Life Ins. Co. v. Commw. Land Title Ins. Co., No. CIV.A. 05-281, 2006 WL 1192998, at *3 (E.D.

Pa. May 3, 2006).

      Nationwide appealed to the United States Court of Appeals for the Third Circuit.  Via

decision issued January 28, 2009, the Third Circuit reversed the District Court's dismissal of the

case.  Nationwide Life Ins. Co. v. Commonw. Land Title Ins. Co., 579 F.3d 304, 317 (3d Cir. 2009).

Specifically, the Appeals Court reinterpreted the insurance Policy considering not only the text of

the contract, but also its purpose and industry custom and practice.  Doing so, it found that, "[t]o

except expressly from ALTA 9 Endorsement coverage a right of refusal or other restrictions noted

in paragraph 1(b)(2) of the Endorsement, an insurer must list those restrictions specifically in

Schedule B.  It is not enough for the insurer merely to list in some part of Schedule B the document

in which the restrictions are embedded."  Id.  It went on to hold that, "Commonwealth bore the

burden of detecting the restrictions stated in the Declaration, and had to list those restrictions

explicitly as exceptions to avoid covering loss from them."  Id. at 319.

      Under Third Circuit mandate, the parties returned to this Court and Plaintiff filed a First

Amended Complaint on November 12, 2009.  The parties have now proceeded through discovery

and filed dispositive motions.  The Motion presently at issue reflects Plaintiff's efforts to exclude

Defendant's expert from either testifying or being considered by the Court during summary

judgment proceedings.

## II.    STANDARD OF REVIEW

The Supreme Court has explained that district court judges perform a "gatekeeping role" with respect to expert testimony by assessing whether such testimony is admissible under Federal Rule of Evidence 702.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590-91, 597 (1993); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 146-47 (1999) (extending Daubert to testimony about "technical or other specialized knowledge") (internal quotations and citations omitted).  Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if  (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.  When the expert testimony at issue is not scientific, "the court must determine whether the expert is qualified to provide such an opinion, whether the testimony assists the fact-finder, whether the testimony is reliable and whether the testimony 'fits' the facts of the case."  D & D Assoc., Inc. v. Bd. of Educ. of N. Plainfield, 411 F. Supp. 2d 483, 487-88 (D.N.J. 2006), aff'd, 2006 WL 755984 (D.N.J. Mar. 20, 2006).

The first requirement of qualification is interpreted liberally to encompass "a broad range of knowledge, skills, and training."  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). At minimum, the expert "must possess skill or knowledge greater than the average layman."  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (quotations omitted).  The second factor of reliability "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good

grounds' for his or her belief." In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 589-90).

Finally, the requirement of "fit" concerns relevancy. "'Expert testimony which does not relate to

any issue in the case is not relevant and, ergo, non-helpful.'" In re Unisys Savings Plan Litig., 173

F.3d 145, 162 (3d Cir. 1999) (quoting Daubert, 509 U.S. at 591).

## III.  DISCUSSION

Plaintiff's Motion seeks to preclude the expert testimony of J. Bushnell Nielsen on multiple

grounds.  First, according to Plaintiff, Mr. Nielsen's report contradicts the Third Circuit's mandate

in this case.  Second, Plaintiff asserts that the language of the Policy is so clear and unambiguous

that expert testimony is irrelevant and unnecessary to assist with its meaning.  Third, Plaintiff claims

that the report is unreliable because it is based solely on Mr. Nielsen's own subjective belief and not

on any reliable methodology.  Fourth, according to Plaintiff, Mr. Nielsen's expert report was

untimely filed and should therefore be stricken.  Fifth, Plaintiff avers that Commonwealth should be

judicially estopped from presenting any arguments or evidence that are incompatible with the

arguments Commonwealth originally relied upon to convince the Court to dismiss this action.

Finally, Plaintiff argues that Mr. Nielsen offers only impermissible conclusions of law, which are

not admissible under the Federal Rules of Evidence.[2]

### A.    Whether Nielsen's Testimony is Precluded by the Third Circuit's Ruling

As a primary matter, Plaintiff contends that the conclusion contained in Mr. Nielsen's report

is directly contradictory to the Third Circuit's ruling on appeal in this case and, therefore, is barred

by the law of the case doctrine.  The law of the case doctrine provides that "when a court decides

upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the

---

[2]  Plaintiff does not present its arguments in this order.  For ease of discussion, however, the
Court has re-ordered the arguments.

litigation." In the Matter of Resyn Corp., 945 F.2d 1279, 1281 (3d Cir. 1991) (quotations omitted). In other words, "once an issue has been decided, parties may not relitigate that issue in the same case." Waldorf v. Shuta, 142 F.3d 601, 616 n.4 (3d Cir. 1998). With this well-established proposition, however, comes the equally well-settled corollary that a trial court "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 950 (3d Cir. 1985). Thus, the trial court is "free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." Id.; see also In re Resyn Corp., 945 F.2d 1279, 1282 (3d Cir. 1991) (noting that issues raised but not reached on a prior appeal are not within the law of the case doctrine.). Moreover, "[t]he doctrine does not apply to dicta." United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa., 316 F.3d 392, 397 n.4 (3d Cir. 2003).

A detailed review of the present case's procedural background reveals the law of the case doctrine to be inapplicable to Mr. Nielsen's expert report. As noted above, the entire dispute in this matter centers upon interpretation of the ALTA 9 Endorsement to the Policy issued to Plaintiff. That Endorsement states:

> The Company [Commonwealth] insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:
> 1.    The existence at Date of Policy of any of the following:
>
>     (a) Covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity priority or enforceability.
>
>     (b) Unless expressly excepted in Schedule B
> . . .

    (2) Any instrument referred to Schedule B as containing covenants,
    conditions or restrictions on the land which, in addition, . . . provides
    for an option to purchase, a right of first refusal or the prior approval
    of a future purchaser or occupant.

(Compl., Ex. A, Title Insurance Policy Between Nationwide Life Insurance Company and

Commonwealth Land Title Insurance Company ("Policy"), at ALTA 9 Endorsement.)  In its

Motion to Dismiss and again on appeal to the Third Circuit, Commonwealth argued that loss

arising from the Declaration between PMI and Liberty Mills was expressly excepted in Schedule B[3]

and, therefore, not covered by the additional assurance of paragraph 1(b)(2) of the ALTA 9

Endorsement.  Via an alternative argument, it contended that Liberty Mills's invocation of its rights

under the Declaration were use restrictions, not prior-approval-of-future-purchaser restrictions,

thereby making the ALTA 9 Endorsement inapplicable.

   When granting the Motion to Dismiss, this Court focused entirely on Commonwealth's first

argument and determined that, based on a plain language reading of the contract, the restrictions

contained in the Declaration had been "expressly excepted" from coverage.  <u>Nationwide</u>, 2005 WL

---

[3]  Schedule B, Part I provides, in pertinent part:

   SCHEDULE B
   EXCEPTIONS FROM COVERAGE
   . . .

   PART I
   . . .

   This policy does not insure against loss or damage . . . which arise by reason of

   . . .
   Declaration of Restrictions between Liberty Mills Limited Partnership and PMI
   Associates dated August 14, 1998.

(Policy at Schedule B)

2716492, at *7.  On appeal, the Third Circuit likewise limited the issue before it to "what a title

insurer must do to except restrictions from coverage under a specific endorsement to the policy."

Nationwide, 579 F.3d at 306.  Answering this inquiry, the Court of Appeals held that:

> To except expressly from ALTA 9 Endorsement coverage a right of refusal or other
> restrictions noted in paragraph 1(b)(2) of the Endorsement, an insurer must list those
> restrictions specifically in Schedule B.  It is not enough for the insurer merely to list
> in some part of Schedule B the document in which the restrictions are embedded.
> Commonwealth thus failed to "expressly except[]" from ALTA 9 Endorsement
> coverage loss from the restrictions contained in the Declaration, and should cover
> Nationwide's claim.

Id. at 317.  It concluded that, "Commonwealth bore the burden of detecting the restrictions stated in

the Declaration, and had to list those restrictions explicitly as exceptions to avoid covering loss

from them."  Id. at 319.

        In stark contrast to the Third Circuit's ruling, Nielsen's expert report engages in no

discussion of the meaning of "expressly excepted" and provides no opinion as to whether

Commonwealth expressly excepted from the ALTA 9 Endorsement coverage the restrictions

contained in the Declaration.  Rather, he returns to Commonwealth's alternative argument

presented in its Motion to Dismiss – one not ruled upon by the prior court decisions – and interprets

the language of the Endorsement, which references "[a]ny instrument referred to Schedule B as

containing covenants, conditions or restrictions on the land which, in addition, . . . provides for an

option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant."

(Policy at ALTA 9 Endorsement.)  Upon reviewing applicable case law and custom and trade

practice, he opines that, "paragraph 1(b)(2)'s reference to an option to purchase, right of first refusal

or right to approve a purchaser or occupant is a reference to restraints on alienation that are not use

restrictions.  This assurance of the ALTA 9 Endorsement indemnifies the insured against loss

8

suffered due to the existence of any such rights that are 'in addition' to the use restrictions excepted in Schedule B." (Pl.'s Mot. *in Limine*, Ex. A ("Nielsen Report"), 11-12.) In other words, Mr. Nielsen concludes that the ALTA 9 Endorsement does not provide coverage for losses due to the use restrictions invoked by Liberty Mills. Such an opinion does not touch upon, let alone contradict, any portion of the Third Circuit's holding.

Plaintiff nonetheless contends that, despite the Third Circuit's carefully confined ruling, the Court expressly addressed and rejected this attempted distinction between prior-approval-of-future restrictions and use restrictions. Specifically, Plaintiff cites to the Court's statement that:

> Because Franklin Mills based its refusal on the Declaration's restrictions, Commonwealth's calling them another name – use restrictions rather than a prior-approval-of-future-purchaser restriction or some other right of refusal . . . – is irrelevant. Though we need not decide whether use restrictions necessarily are restrictions on the approval of future purchasers of property, they are deemed so here because that is the practical effect of Franklin Mill's actions in this case. (In any event, use restrictions are, like prior-approval-of-future purchaser restrictions, among the important items of information lenders and owners seek in obtaining title insurance policies.)

Id. at 306 n.3.

The Third Circuit's commentary on this argument, however, was nothing more than *dicta*, as evidenced by several factors. First, the discussion took place in a footnote inserted within the "Factual and Procedural Background" section of the opinion, not within the body of the opinion or even under the "Discussion" section. Id. Second, the Third Circuit's statement that it "need not decide whether use restrictions necessarily are restrictions on the approval of future purchasers of property" clearly indicated that it was not including this opinion in its holding or mandate. Finally, had the Third Circuit intended for this statement to become controlling, it would have necessarily found that Plaintiff was entitled to coverage and remanded the matter only for a calculation of

benefits.  It did not do so.  Rather, it remanded for further proceedings consistent with its opinion.

Id. at 319.  Accordingly, the Court declines to find that this footnote constitutes the law of the case

that now binds the Court and the parties as to the issue of whether the restriction invoked by Liberty

Mills was covered by the ALTA 9 Endorsement.

In short, nothing in the Third Circuit's opinion suggests that it, either implicitly or

expressly, disposed of the issue opined upon by Mr. Nielsen.  The Third Circuit's remarks on this

issue are, by its own description, nothing more than *dicta* to which the law of the case doctrine does

not apply.  United Artists, 316 F.3d at 397 n.4.  Accordingly, because no prior ruling on the issue

binds the parties, Defendant's expert report does not violate the law of the case.

**B.** **Whether the Language of the Policy Is So Clear as to Not Require Expert Testimony**

Alternatively, Plaintiff asserts that the unambiguous language of the ALTA 9 Endorsement

that Mr. Nielsen interprets is not properly the subject of expert testimony.  It explains that a basic

reading of the plain language of the Endorsement offers an unequivocal meaning:  "if an instrument

on Schedule B of the Title Policy is referred to as containing conditions, covenants or restrictions,

and, in addition that instrument provides for (i) an easement, (ii) a lien for liquidated damages, (iii)

a private charge or assessment, or (iv) an option to purchase, a right of first refusal or a right to

approve a future purchaser or occupant, then Commonwealth has insured Nationwide for damages

caused by such an instrument."  (Pl.'s Mem. Supp. Mot. *in Limine* 4.)  Because such an

unambiguous contract is not subject to reinterpretation by extraneous expert evidence, Plaintiff

contends that the Nielsen report must be stricken from the record.

Plaintiff's argument, however, misconstrues the applicable law.  Under Pennsylvania

jurisprudence, the court must "ascertain the intent of the parties by reading the policy as a whole, and . . . give unambiguous terms their plain meaning." Nationwide, 579 F.3d at 307-08 (citing Jacobs Constructors, Inc. v. NPS Energy Servs., Inc., 264 F.3d 365, 375-76 (3d Cir. 2001); J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 363 (3d Cir. 2004)). The court must, however, also consider evidence of industry custom and practice. Id. at 308 (citing Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001)). Indeed, the Pennsylvania Supreme Court has held that trade usage must *always* be considered in interpreting a contract, regardless of whether a phrase is ambiguous. Sunbeam, 781 A.2d at 1193 ("In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract."). As the Court explained, "[i]f words have a special meaning or usage in a particular industry, then members of that industry are presumed to use the words in that special way, whatever the words mean in common usage and regardless of whether there appears to be any ambiguity in the words." Id.; see also Lititz Mut. Ins. Co. v. Steely, 785 A.2d 975, 982 n.12 (Pa. 2001) ("Once such custom or usage is established . . ., it will be considered part of the contract, the presumption being that the contracting parties knew of such custom or usage and contracted with reference to it."); Simon Wrecking Co., Inc. v. AIU Ins. Co., 530 F. Supp. 2d 706, 713-14 (E.D. Pa. 2008). In other words, even absent an ambiguity, a court may consider evidence of custom in the industry or usage in the trade. Swiss Reins. Am. Corp. v. Airport Indus. Park, Inc., 325 Fed. Appx. 59, 65 (3d Cir. 2009); USX Corp. v. Liberty Mut. Ins. Co., 444 F.3d 192, 199 (3d Cir.), cert. denied, 549 U.S. 888 (2006); see also AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 220 (3d Cir. 2009) ("Parol evidence cannot be used to contradict the provisions of such a contract. In determining whether such a contradiction would

occur, however, the text of the contract must first be interpreted in light of any evidence of trade usage and the performance of the parties under the contract."); see also PA. CONS. STAT § 2202 ("Terms . . . which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein . . . may be explained or supplemented . . . (1) by course of performance, course of dealing or usage of trade (section 1303).")

In the present case, the parties dispute the precise meaning of the phrase "covenants, conditions or restrictions on the land" as contained in the ALTA 9 Endorsement. Pennsylvania law clearly allows for consideration of trade usage and custom to interpret that Policy language and determine whether it has a particular meaning within the land title industry. Mr. Nielsen's Report is directed to that custom and practice and, more precisely, to the meaning of the term "covenants, conditions or restrictions on the land" in connection with a right of first refusal. Thus, it is relevant for purposes of Federal Rule of Evidence 702.

## C. Whether Mr. Nielsen's Conclusion Are Reliable or Based Only on Subjective Belief

Plaintiff next argues that Mr. Nielsen's report should be excluded because it is based solely on subjective belief and unsupported opinion. Plaintiff specifically contends that Nielsen's limitation of the phrase "covenants, conditions or restrictions" found in the ALTA 9 Endorsement finds no basis either in the expert report or its attachments; rather "[i]t is simply plucked out of thin air." (Pl.'s Mem. Supp. Mot. *in Limine* 8.) Moreover, Plaintiff suggests that Mr. Nielsen "offers no methodology, reliable or otherwise, to support th[e] peculiar proposition" that "easements, liens for liquidated damages, private charges, private assessments, purchase options, rights of first refusal,

rights to approve a future purchaser and rights to approve a future occupant . . . cannot be covenants, conditions or restrictions." (Id.)  Plaintiff concludes that "[g]iven that Mr. Nielsen's opinions contradict applicable law, his methods cannot possibly be reliable."  (Id. at 9.)

The Restatement (Second) of Contracts defines a "usage of trade" as "having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to [a particular agreement]."  RESTATEMENT (SECOND) OF CONTRACTS § 222(1); see also 13 PA. CONS. STAT. § 1303(c).  "[T]o be an interpretation aid, trade usage evidence need not demonstrate that a particular term always carries a particular meaning or that the particular meaning claimed cannot be otherwise stated."  AstenJohnson, 562 F.3d at 222.  The Pennsylvania Supreme Court has held that, "[w]here terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter."  Resolution Trust Corp. v. Urban Redev. Auth. of Pittsburgh, 638 A.2d 972, 975 (Pa. 1994).  In such cases, "the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness."  Crowley v. Chait, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (citing Kumho Tire, 526 U.S. at 152). The methodology of proffered nonscientific testimony need not be subjected to rigorous testing for scientific foundation or peer review.  Id.

In the present matter, Mr. Nielsen is, despite Plaintiff's protestations to the contrary, clearly well-qualified to opine on custom and trade usage within the land title insurance industry.  He has twenty-nine years of work experience in that industry.  (Nielsen Report 12.)  During sixteen of those years, he was employed with two title insurance companies for whom he examined and issued title insurance commitments, served as chief underwriting counsel in two states, was the regional

claims counsel for nine states, and acted as a state operations manager.  (Id. at 12.)  In the remaining thirteen years of his land title insurance experience, Mr. Nielsen worked in private legal practice, engaged almost exclusively on matters involving title insurance, real estate titles, and conveyancing issues.  (Id.)  Beyond his work experience, he has conducted at least 200 training seminars and was the past president of both the Michigan Land Title Association and the Wisconsin Land Title Association.  (Id.)  Further, he is a member by invitation of the America College of Real Estate Lawyers and has assisted in the drafting of several Wisconsin laws concerning real estate conveyancing.  (Id.)  Finally, Mr. Nielsen is the author of a 1,400 page treatise on title and escrow claims, which is used by employees of every major title insurer in the United States, and, since 1998, has been the editor of *The Title Insurance Law Newsletter*.  (Id.)  Such an extensive background in the land title insurance industry unequivocally puts Mr. Nielsen in the particular class of persons who could testify as to the custom and trade usage of certain terms used within title insurance policies.  No further "methodology" for his opinions is necessary.[4]

Plaintiff also contends that Mr. Nielsen's theories conflict with long-established Pennsylvania law, meaning that "his methods cannot possibly be reliable."  (Pl.'s Mem. Supp. Mot. *in Limine* 9.)  It goes on to cite to several Pennsylvania cases purportedly showing that the terms "covenants," "conditions," and "restrictions" are used interchangeably to refer to a wide variety of

---

[4]  Plaintiff emphasizes the fact that an expert report authored by Mr. Nielsen was excluded in a different case because it contained legal conclusions and failed to provide any support for the conclusions reached.  See Fidelity Nat. Title Ins. Co. of NY v. Intercounty Nat'l Title Ins. Co., No. CIV.A.00-5658, 2001 WL 789218, at *2 (N.D. Ill. Jul. 12, 2001).  Mr. Nielsen's report in that case, however, was on an entirely different subject area, *i.e.* the legal requirements for depositing and delivering escrow money, the liability of title agencies and underwriters, and defining the fiduciary duty an escrowee has to principals.  Id. at *2.  Plaintiff has not made any showing that the report in that matter is at all comparable to the one at issue in this matter.

real estate encumbrances. (Id. at 8-9 (citing Central Delaware County Auth. v. Greyhound Corp., 588 A.2d 485, 487-88 (Pa. 1991); Tohida v. Gelbert Improvement Co., et al., 58 Pa. D. & C. 321, 323 (1946); Kaufman v. Bergert, 45 A. 725, 725 (Pa. 1900); Barton v. Thaw, 92 A. 312 (Pa. 1914)).) Notably, however, Mr. Nielsen also cites an ample number of authorities – both legal and industry-based – in support of his opinion. (Nielsen Report 6-11.) The mere existence of such conflicting sources does not require the exclusion of Mr. Nielsen's opinion. Rather, if an expert's testimony "rests upon 'good grounds . . .' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) (quotations omitted); see also Keller v. Feasterville Family Health Ctr., 557 F. Supp. 2d 671, 678 (E.D. Pa. 2008) (where expert's methodology in formulating opinion is reliable, any weaknesses or inadequacies can be highlighted through effective cross-examination).[5]

In short, the Court deems Mr. Nielsen's report to be sufficiently reliable to survive Rule 702 scrutiny. Moreover, and without question, the proffered testimony is particularly relevant to the issue before the Court. Accordingly, the Court declines to exclude it on this ground.

**D.      Whether Mr. Nielsen's Report Was Untimely**

Plaintiff next seeks exclusion of Mr. Nielsen's report on the basis that it was not timely

---

[5] Plaintiff suggests that Mr. Nielsen's report contradicts the Third Circuit's opinion, wherein it found that the term "restrictions" included "defects in title, liens, easements, encumbrances, conditions, and covenants (*such as the rights at issue in this case*) affecting the insured property." Nationwide, 579 F.3d at 308 (emphasis added). Notably, however, this statement was irrelevant to the ultimate holding of the opinion, was made in a footnote, and, most importantly, was expressly made only "[f]or purposes of [the] opinion." Id. Such *dicta*, as noted above, cannot constitute the law of the case.

submitted.  Specifically, Plaintiff offers the following conclusory argument:

> In accordance with this Court's scheduling orders and the Federal Rules of Civil Procedure, expert reports were due August 17, 2010.  F.R.Civ.P. 26(a)(2).  Mr. Nielsen's Report was not served until September 3, 2010.  The Report was therefore untimely.  Mr. Nielsen's Report should be struck and his testimony barred.

(Pl.'s Mem. Supp. Mot. *in Limine* 9.)

According to the exhibits submitted by Defendant, however, some confusion existed between the parties' counsel as to when expert reports were due.  The Court's original January 21, 2010 Order set discovery to be completed by July 30, 2010, and indicated that the case would be placed in the trial pool on August 30, 2010.  (Court Order January 21, 2010.)  Thereafter, on July 6, 2010, the Court extended deadlines so that discovery was to close on September 13, 2010, dispositive motions would be filed by September 18, 2010, and the case would be placed in the trial pool on October 14, 2010.  (Court Order July 6, 2010.)  Finally, on August 31, 2010, the dispositive motion deadline was extended to October 18, 2010, with the trial pool date set for November 15, 2010.  (Court Order Aug. 31, 2010.)  Pursuant to this latest order, and under Federal Rule of Civil Procedure 26(a)(2)(D),[6] expert reports were thus required to be submitted by August 17, 2010.

---

[6]   This Rule states as follows:

> Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
>
> **(i)** *at least 90 days before the date set for trial or for the case to be ready for trial*; or
>
> **(ii)** if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

Fed. R. Civ. P. 26(2)(D) (emphasis added).

On September 2, 2010, counsel for Defendant sent the following e-mail to Plaintiff's counsel:

> Just confirming two things: (1) continuation of NW30(b)(6) set for 9/20 at your office at 10:00; (2) we have agreed that since things are, due to scheduling, happening after discovery deadline, neither of us objects to that and expert reports as well, so long as they are disclosed by end of September or so, will not be objectionable.
>
> Thanks and have a good holiday weekend.  You'll have our first report by mail tomorrow.

(Def.'s Resp. Mot. *in Limine*, Ex. D-1.)  The following day, Defendant delivered a copy of Nielsen's report to Plaintiff's counsel.  Approximately five weeks later, however, counsel for Plaintiff responded to this e-mail, as follows:

> I was cleaning up my files today and noticed that I had not responded to this email.  Obviously we finished the 30(b)(6) on September 20th.  My understanding with regard to expert was that we would produce them for depositions after the deadline if either of us requested.  I never agreed that reports produced after discovery was closed were timely.  My understanding is that we reserved all objections.

(Id. Ex. D-2.)  In light of this belated e-mail, counsel for both sides engaged in another e-mail exchange, on October 11, 2010, with each party expressing a different view of the "agreement" between them as to the production of expert reports.  (Id. Exs. D-3, D-4.)  Plaintiff's Motion *in Limine* was filed four days later.

Irrespective of the parties' actual agreement, the Court now sees no reason to strike Mr. Nielsen's report as untimely.  First, Defendant's counsel was under a reasonable belief that he had until the end of September to file the expert report, as evidenced by his September 2, 2010 e-mail.  While Plaintiff's counsel had, in fact, read Defendant's e-mail on September 2nd, (see id. Ex. D-4), he failed to apprise opposing counsel of any purported or imagined error until five weeks later.  At that time, it was far too late for Defendant to seek leave of Court to amend the deadlines so as to

timely file its expert report. Second, although Defense counsel believed it had until the end of September to provide the report, counsel submitted it on September 3, 2010, only sixteen days after the official Court deadline. Such a delay is far from gross or undue. Finally, Plaintiff points to – and this Court can find – no prejudice to Defendant resulting from the delay, particularly in light of the fact that Plaintiff has been able to prepare a rebuttal expert report. See Chase Manhattan Mortg. Corp. v. Advanta Corp., No. CIV.A.01-507, 2004 WL 422681, at *10 (D. Del. Mar. 4, 2004) ("The touchstone for determining whether to exclude untimely expert reports is whether the party opposing their admission is prejudiced.") (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791 (3d Cir. 1994). As such, the Court rejects this portion of Plaintiff's Motion.

**E.      Whether Commonwealth's Arguments Should Be Judicially Estopped by Incompatible Arguments Defendant Used in Its Earlier Motion to Dismiss**

In a fifth effort to exclude Mr. Nielsen's report, Plaintiff argues that Defendant should be judicially estopped from using the report, or otherwise presenting arguments or evidence, that are incompatible with Defendant's initial arguments used to deny coverage. This doctrine of judicial estoppel states that "'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)); see also In re Armstrong World Indus., Inc., 432 F.3d 507, 517 (3d Cir. 2005) ("Judicial estoppel can be applied when a party asserts a certain position in a legal proceeding and prevails, only to assert a contrary position later on because of changed interests."). Judicial estoppel bars a party's argument only when "(1) the party to be estopped is

asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity."  <u>Montrose Med. Group Participating Sav. Plan v. Bulger</u>, 243 F.3d 773, 777-78 (3d Cir. 2001).  Notably, "[i]t is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts."  <u>In re Chambers Dev. Co.</u>, 148 F.3d 214, 229 (3d Cir. 1998).  Indeed, an inconsistent position alone does not trigger the doctrine,

> unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court. An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

<u>Chambers</u>, 148 F.3d at 229 (quoting <u>Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.</u>, 81 F.3d 355, 362 (3d Cir. 1996)).

Plaintiff contends that, through the attachments to the report, Defendant has tacitly admitted that Nationwide's original interpretation of the Policy – *i.e.*, that exceptions to the Policy must be specifically listed in Schedule B – was correct.  Moreover, it claims that to the extent the ultimate purpose of Nielsen's report is to set the stage for Commonwealth to argue that it was not required to list "use restrictions" on Schedule B, this argument is "entirely incompatible" with Commonwealth's earlier argument that <u>no</u> restrictions are required to be listed on Schedule B. (Pl.'s Mem. Supp. Mot. *in Limine* 13.)  Accordingly, it claims that "Commonwealth should be estopped not only from using Mr. Nielsen's testimony and his Report, but also from offering any evidence or arguments to define, characterize, minimize or classify those matters from paragraph

1(b)(2) that must be listed on Schedule B."  Id.

        This argument fails to establish the two crucial elements of judicial estoppel.  First, nothing in the record shows that Defendant has asserted inconsistent positions.  In its Motion to Dismiss, Defendant claimed that the ALTA 9 Endorsement was not triggered because the Declaration was "expressly excepted" by Schedule B of the Policy.  (Def.'s Mot. Dismiss 4-5.)  Although this Court initially agreed with Defendant as to its interpretation of the phrase "expressly excepted," the Third Circuit conclusively ruled to the contrary.  This decision left Defendant with its second argument, raised via a footnote in the Motion to Dismiss, that the ALTA 9 Endorsement only indemnifies the insured against loss suffered due to restraints on alienation that are not use restrictions, unlike those in the subject Declaration.  This argument, which is at the very foundation of Mr. Nielsen's report, is not at odds with any previous contention made by Defendant.

        Plaintiff's current claim is nothing more than a criticism of Defendant's original interpretation of the Policy and an assertion that Defendant's expert has now proven that interpretation to be incorrect.  Crucially, however, both Defendant's Motion to Dismiss and Plaintiff's response were premised on a plain-meaning interpretation of the Policy language.  Since the Third Circuit's ruling, which also looked at custom and trade usage, Defendant has undertaken further research and engaged an expert, which has shown that some industry usage of the phrase "expressly excepted" is, in fact, inconsistent with Defendant's initial plain-language interpretation.  As noted by Defendant, "there was no logical reason for Commonwealth to look into third-party or other extrinsic evidence to see if that plain meaning were incorrect prior to Nationwide's appeal of this court's grant of the motion to dismiss."  (Def.'s Resp. Mot. *in Limine* 14.)   As a matter of necessity, Defendant has now adopted the interpretation mandated by the Third Circuit, and moved

on to its alternative argument that the restrictions included in the Declaration were not brought into coverage by the ALTA 9 Endorsement. Certainly, there is no inconsistency in such an argument.

Likewise, the second crucial element for invoking judicial estoppel – bad faith by the party to be estopped – is absent in this matter. Even if the Court could find the existence of inconsistent positions, no evidence establishes that Defendant asserted such positions in bad faith. Rather, Defendant set forth what it believed to be the plain meaning of the Policy – an interpretation with which this Court concurred. When the Third Circuit took the opposite stance, Defendant had no choice but to accept that interpretation and proceed with a different argument. The mere facts that some newfound external sources lend support to Plaintiff's original interpretation of the Policy and that Defendant's expert cites those sources to bolster his interpretation of the ALTA 9 Endorsement does not mean that Defendant acted with any "intent to play fast and loose with the court." Ryan, 81 F.3d at 361. As Plaintiff has not come forward with any showing of a "scheme" by Defendant "to mislead the court," judicial estoppel does not preclude Defendant from presenting its present arguments.

### F.  Whether Nielsen is Offering Only an Inadmissible Conclusion of Law

Finally, Plaintiff argues that Mr. Nielsen's report is inadmissible because he attempts to define the meaning of the Title Policy which is clearly a conclusion of law. Under Federal Rule of Civil Procedure 704, an expert may provide an opinion that embraces an ultimate issue to be decided by the trier of fact. FED. R. EVID. 704. Nonetheless, "[t]he district court must limit expert testimony so as to not allow experts to opine on 'what the law required' or 'testify as to the governing law.'" Casper v. SMG, 389 F. Supp. 2d 618, 621 (D.N.J. 2005) (quoting U.S. v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)). "[T]he purpose of the rule excluding expert opinions on

legal issues is to avoid confusing the jury or usurping the role of the judge in instructing the jury on the relevant law." Suter v. Gen. Accident Ins. Co. of Am., 424 F. Supp. 2d 781, 793 (D.N.J. 2006). Thus, when an expert purports to testify as to the ultimate *legal* issue, that testimony is not admissible and should not be considered on summary judgment. See, e.g., Casper, 389 F. Supp. 2d at 621 (expert's report relying on case law and statutes, and applying them to the evidence of record constituted an impermissible conclusion of law); Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Plan and Trust Agreement, 812 F. Supp. 1376, 1378-79 (E.D. Pa. 1992) (holding that proposed expert testimony as to propriety of employer's requiring employee to sign general release as condition of receiving pension benefits would take form of opinion on question of law and, thus, was inadmissible).

Notably, however, when the expert report concerns customs and practices of a particular industry, "the line between admissible and inadmissible expert testimony . . . often becomes blurred." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 218 (3d Cir. 2006). It is well-settled that expert testimony regarding the interpretation of an insurance policy is impermissible. Smith v. Cont'l Cas. Co., No. CIV.A.07-1214, 2008 WL 4462120, at *1 (M.D. Pa. Sept. 30, 2008), aff'd, 347 Fed. Appx. 812 (3d Cir. 2009). The Third Circuit, however, has recognized that parties working in specialized fields "may understand the argot of their business and see no need to define terms. They may be able to juggle multiple meanings of a term, with no need for explanation." Swiss Reins. Am Corp., 325 Fed. Appx. at 65. For the court or factfinder to understand what is meant by a specific insurance contract term, evidence of custom and usage may well be of assistance. Id. Such "'evidence of trade practice and custom does not trump other canons of contract interpretation, but rather cooperates with them.'" Keegan v. Steamfitters Local Union No.

420 Pension Plan, 67 Fed. Appx. 744, 750 (3d Cir. 2003) (quoting Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 753 (Fed. Cir. 1999)). To that end, numerous courts, both within and outside of the Third Circuit, have permitted expert testimony as to custom and practice as to the meaning of a particular contract term within an insurance policy, so long as the expert's testimony does not venture into the realm of purely legal contract construction or interpretation. See, e.g., First Nat'l State Bank of NJ v . Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981) (affirming use of expert testimony as to customs in the banking industry, even in the face of an unambiguous contract); Manhattan Re-Ins. Co. v. Safety Nat'l Cas. Corp., 83 Fed Appx. 861, 863 (9th Cir. 2003) (noting that expert testimony about insurance industry contract drafting custom and practice was admissible so long as expert "did not improperly testify about the legal interpretation of contract clauses"); Smith, 2008 WL 4462120, at *1 (recognizing that expert testimony as to industry customs and practice may be helpful so long as expert does not engage in legal construction of insurance policy terms); Simon Wrecking Co., 530 F. Supp. 2d at 715-16 (considering expert testimony regarding custom and trade usage of term "sudden and accidental" in insurance policy); N. River Ins. Co. v. Employers Reins. Corp., 197 F. Supp. 2d 972, 990-91 (S.D. Oh. 2002) (permitting expert testimony as to the custom, usage, or practice in the American reinsurance market as to the "follow the fortunes" doctrine).

In the present case Mr. Nielsen's report presents a combination of proper testimony as to custom and practice within the title insurance industry and an improper statement of the legal definition of various terms set forth in treatises, cases, and statutes. To the extent that Mr. Nielsen testifies as to his understanding of industry custom and practice as to (1) how title insurers classify transfer restrictions and use restrictions and (2) what the term "covenants, conditions or restrictions

on the land" refers to in the ALTA 9 Endorsement (sections III and IV of Nielsen's report under the "Opinions" section), the Court finds his report admissible and useful in understanding the industry usage of these terms. To reach his conclusions, Mr. Nielsen spends ample time referencing his own experience, title insurers' underwriting manuals, bulletins, articles by leading title insurers, leading treatises, and the general practice of underwriting employees. See Robert Billet Promotions, Inc. v. IMI Cornelius, Inc., No. CIV.A.95-1376, 1998 WL 151806, at *3 (E.D. Pa. Apr. 1, 1998) (noting that expert's interview of industry people, review of industry documents and accounting rules, and consideration of industry treatises constituted an appropriate methodology upon which businessmen and accountants would rely in the ordinary course of their trades). Although he also makes reference to some legal sources, his report "does not reach what the law requires, but rather, touches upon what a person familiar with the custom of the insurance industry would believe to be the impact of the law upon the business." Suter v. Gen. Accident Ins. Co. of Am., 424 F. Supp. 2d 781, 793 (D.N.J. 2006). Accordingly, the Court deems these portions of his report admissible.

Mr. Nielsen, however, also goes on to define purchaser approval rights as direct restraints on alienation, and use restrictions as encumbrances on title and indirect restraints on alienation (sections I and II of the report under the "Opinions" section). In doing so, he references none of the aforementioned sources, but rather turns almost exclusively to legal sources such as the Restatement, Pennsylvania state legal journals, and case law. Such conclusions as to legal definitions are not the proper subject of competing expert opinions, but rather are more appropriately arguments among lawyers, with the ultimate conclusions being left to the courts. See Crink v. People's Benefit Life Ins. Co., No. CIV.A.04-1068, 2005 WL 730688, at *4 (E.D. Pa. Mar. 29, 2005) (finding that expert's report was inadmissible because it was "littered with impermissible

24

legal conclusions on the issue of contract construction."); <u>GallatinFuels, Inc. v. Westchester Fire Ins. Co.</u>, 410 F. Supp. 2d 417, 420-21 (E.D. Pa. 2006) (holding that expert's opinion on the application of the insurance policy to plaintiff's loss are impermissible legal conclusions because expert's "opinions on the issue of contract construction would not assist the jury in understanding coverage," and are "based solely on [expert]'s subjective interpretation of the policy language"). While the Court recognizes that these portions of the report are used to provide context for his later opinions, the dictates of Federal Rule of Evidence 704 do not allow him to place a stamp of expertise on such definitions.

To that end, the Court now reaches a two-fold finding as to the admissibility of Mr. Nielsen's expert report. Mr. Nielsen's interpretation of the various legal documents as to the classification and definition of both (1) "direct" restraints on alienation and (2) indirect restraints on alienation/use restrictions are not admissible because they usurp the legal interpretive ability of the court. As such, these portions of the report (sections I and II under "Opinions") will be stricken and not considered in connection with the pending cross-motions for summary judgment. To the extent, however, that Mr. Nielsen discusses title insurance industry practice and customs and whether the reference, in the ALTA 9 Endorsement, to "covenants, conditions or restrictions on the land" generally refers to restraints on alienation that are not use restrictions (sections III and IV under "Opinions"), the Court will take those reports into consideration during summary judgment proceedings.[7]

_____

[7] This bifurcated approach to the Motion *in Limine* is a remedy commonly used in these types of motions. <u>See</u> <u>Brill v. Marandol</u>, 540 F. Supp. 2d 563, 568-71 (E.D. Pa. 2008) (legal conclusions by expert were not admissible, but conclusions based on industry custom and practice would be admissible); <u>Smith</u>, 2008 WL 4462120 at *1-2 (holding that expert report regarding legal conclusions as to construction of insurance policy terms were not admissible, but portion of

## IV. CONCLUSION

Having fully considered Plaintiff's Motion *in Limine*, the Court finds no basis on which to exclude the entirety of Defendant's expert's testimony. Mr. Nielsen's report, while potentially at odds with some *dicta* contained within the Third Circuit's opinion in this case, does not contradict either the holding or the mandate of that opinion. Moreover, Pennsylvania law clearly makes expert testimony as to industry custom and usage always admissible when interpreting commercial contracts, regardless of whether the contract language is ambiguous. The Report's conclusions are well-founded on Mr. Nielsen's extensive experience in the land usage industry. Finally, the Court finds that the Report was timely submitted and is not barred by any principles of judicial estoppel. Nonetheless, the Court deems sections I and II of the Report to be impermissible conclusions of law, as they seek to provide legal definitions – via reference to various legal sources – for "direct restraints on alienation" and "use restrictions," without offering any specialized expert knowledge on these subjects. As such, those portions of the Report shall be excluded, both from this Court's consideration during summary judgment proceedings and at any subsequent trial. The remainder of the Report, however, shall be admissible.

An appropriate Order follows.

---

report addressing insurance industry standards was admissible).