# IN THE UNITED STATES DISTRICT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONWIDE LIFE INSURANCE | : | |
| COMPANY, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 05-281 |
| COMMONWEALTH LAND TITLE | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                    February 17, 2011

Currently pending before the Court are Defendant Commonwealth Land Title Insurance

Company's Motion for Summary Judgment and Plaintiff Nationwide Life Insurance Company's

Cross-motion for Summary Judgment. For the following reasons, Plaintiff's Motion is granted in

part and denied in part, and Defendant's Motion is denied in its entirety.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In 1988, the Franklin Mills Mall (the "Mall") in Philadelphia County was being

developed by Liberty Mills Limited Partnership ("Liberty Mills"). On June 28, 1988, in

connection with that development, Liberty Mills entered into a Master Declaration and

Agreement of Easements, Covenants, Conditions and Restrictions with Liberty Mills Residual

Limited Partnership (the "Master Declaration"). (Am. Compl. ¶ 7; Answer ¶ 7.) This Master

Declaration governed all stores in the Mall, including the property at issue in this case, located at

1933 Franklin Mills Circle, a/k/a 4301 Byberry Road Unit M3, Philadelphia, Pennsylvania (the

"Property"). (Def.'s Mot. Summ. J., Ex. 5.) The Master Declaration provided that "[n]o Occupant shall use or permit the use of its Property within the Total Parcel for any use or operation which is . . . substantially inconsistent with and/or materially detrimental to the operation of a shopping center and other complementary developments." (Id. at 36.) Included among such "detrimental" uses or operations were: (a) any use which emits an obnoxious odor, noise or sound; (b) any use which is physically damaging to other portions of the Franklin Park Development or which is dangerous; (c) any assembly or manufacturing operation; (d) any trailer court, mobile home park, junk yard, stock yard, or animal raising operation (other than pet shops and veterinarians); (e) any dump or disposal; (f) any warehouse; (g) any central laundry, dry cleaning plant, or laundromat (not including a facility providing on-site services oriented to pick-up and delivery by the ultimate consumer); (h) a mortuary; (i) an establishment selling or exhibiting pornography; (j) a flea market; and (k) an activity which unreasonably physically interferes with the business of any party or other occupant. (Id. at 36-37.) In addition, no occupant of the Mall was to use or permit the use of its property for: (a) a night club, disco, or dance hall; (b) a lot for the sale of new or used cars; (c) a motor vehicle repair or service shop, or a car wash; or (d) a pool or billiards hall (unless operated as a part of a large-scale recreation or entertainment facility). (Id. at 37.)

Thereafter, on August 15, 1988, a company by the name of PMI Associates ("PMI") purchased a parcel of the Mall from Liberty Mills. (Am. Compl. ¶ 8; Answer ¶ 8.) At that time, PMI and Liberty Mills entered into a Declaration of Restrictions (the "Declaration of Restrictions"). (Am. Compl. ¶ 9; Answer ¶ 9; Def.'s Mot. Summ. J., Ex. 6.) The Declaration of Restrictions set forth an "Operating Covenant," which applied to a period of three years after the

opening of the business on the Property. (Def.'s Mot. Summ. J., Ex. 6, 6-7.) Such restrictions

required that the Property be operated as a Phar-Mor variety or general merchandise retail store,

which would include the sale of health and beauty aids, pharmaceuticals, video tapes,

housewares, pre-packaged food items, greeting cards, automotive supplies, books and magazines,

and school supplies and stationary. (Id.) After the expiration of this Operating Covenant period,

the Declaration of Restrictions provided the following:

> Buyer shall have the right to use the Property and/or the building for any single retail use which is (1) permitted under all applicable laws, ordinances, orders, rules, regulations and requirements of all governmental authorities having jurisdiction over the Shopping Center Project, (2) consistent with and permitted under the Master Declaration, and (3) compatible with an enclosed super-regional discount specialty retail shopping center (or such other type of shopping center as may be operated by Seller within the Shopping Center Project in the future); provided, however, that in no event shall Buyer use the Property and/or the building for any of the purposes listed on Exhibit 3 [listing the types of stores already in the Mall]; and provided further, however, that *Buyer shall not change the use of the Property from a variety or general merchandise store (as described above) without prior written consent of Seller* (which shall not be unreasonably withheld or delayed if the proposed use otherwise satisfies the foregoing requirements of this sentence.) In no event shall the Property be used or occupied for any purpose or in any manner other than as set forth in this [paragraph]. With respect to the foregoing restrictions on the use of the Property, Buyer hereby acknowledges and agrees that the Property is part of the larger Shopping Center Project, and that Seller has a substantial interest in the ownership and operation of the Shopping Center Project. Accordingly, Seller desires to insure that the Property being conveyed to Buyer will be used in a manner consistent with the plans and designs of Seller (for both the appearance and the operation of the Shopping Center Project) and not in a manner that would injure or adversely affect the remaining portions of the Shopping Center Project and/or the operation thereof. Buyer hereby further acknowledges the legitimacy of these objections, and acknowledges and agrees that its acceptance of the use restrictions set forth in this Sub-paragraph 2(A) is a material inducement to Seller to convey the Property to Buyer, by virtue of its need to protect the legitimate objectives more particularly described above.

(Id. at 7 (emphasis added).)

Aside from the foregoing language, the Declaration of Restrictions contained several other provisions pertinent to the present dispute. First, it set forth a "Repurchase Option," which granted Franklin Mills Associates Limited Partnership ("Franklin Mills"), the successor-in-interest to Liberty Mills, (Def.'s Mot. Summ. J., Ex. 3, Dep. of Gregg Goodman, 11:1-17:5, Aug. 18, 2010 ("Goodman Dep.")), the right to buy back the property from PMI under certain circumstances. (Def.'s Mot. Summ. J., Ex. 6, 9-12.) It stated specifically that "[i]f at any time after the expiration of the Buyer's three (3) year covenant to operate its building as provided in Sub-paragraph 2(B) above, Buyer or any occupant of the Property desires to cease conducting business to the public in its building on the Property, then Seller may, at its sole option, repurchase the property . . ." (Id. at 10.) In addition, the Declaration required PMI to pay to Franklin Mills annual assessments for the purpose of (1) contributing to the funding of the Promotion Fund used to advertise and promote businesses in the Mall and (2) maintaining the Common Areas ("CAM charges"). (Id. at 13-15.) According to the Declaration, "[n]o sale or transfer shall relieve the owner of the Property . . . from liability for any Annual Assessments." (Id. at 14.) Finally, the Declaration of Restrictions provided that "[a]ll of foregoing covenants, conditions, restrictions and easements shall be covenants running with the land, and shall be binding upon the parties hereto and their respective representatives, successors and assigns, and all subsequent owners and occupants of the Property . . . ." (Id. at 30.)

In 2001, PMI took out a $3.5 million loan from Plaintiff Nationwide Life Insurance Company ("Nationwide") using the above Property as security (the "Mortgage"). (Am. Compl. ¶¶ 13-14; Answer ¶¶ 13-14; Def's Mot. Summ. J., Ex. 4.) The Mortgage explicitly stated that PMI "covenants and warrants with and to Lender that, subject to the Permitted Exceptions (as

hereinafter defined), Borrower is indefeasibly seized of the Property and has good right, full

power, and lawful authority to convey and encumber all of the same as aforesaid." (Def.'s Mot.

Summ. J., Ex. 4, at Bates No. 3608.) In the "Permitted Exceptions" attachment, the Mortgage

explicitly referenced both the Master Declaration and the Declaration of Restrictions.[1] (Id. at

Bates No. 3642.)

In connection with this Mortgage, Nationwide purchased a title insurance policy (the

"Policy") from Defendant Commonwealth Land Title Insurance Company ("Commonwealth").

(Def.'s Mot. Summ. J., Ex. 2.) The Policy contained several crucial provisions. First, it

encompassed what is known as an American Land Title Association 9 Endorsement (the "ALTA

9 Endorsement"), covering Nationwide against, among other things, loss or damage sustained by

reason of:

>    1.    The existence at Date of Policy of any of the following:
>
>          (a) Covenants, conditions or restrictions under which the
>          lien of the mortgage referred to in Schedule A can be
>          divested, subordinated or extinguished, or its validity
>          priority or enforceability.
>
>          (b) Unless expressly excepted in Schedule B
>          . . .
>                (2) Any instrument referred to in Schedule B as
>                containing covenants, conditions or restrictions on
>                the land which, in addition, (i) establishes an
>                easement on the land; (ii) provides a lien for
>                liquidated damages; (iii) provides for a private
>                charge or assessment; (iv) provides for an option to
>                purchase, a right of first refusal or the prior approval
>                of a future purchaser or occupant.

---

[1] The only other "Permitted Exceptions" referenced were (1) the License agreement between
Franklin Mills and PMI and (2) rights granted Philadelphia Electric Company. (Id. at Bates No.
3642.)

(Id. at Bates No. 591.) Second, it contained the referenced Schedule B, entitled "Exceptions from Coverage," which stated as follows:

> SCHEDULE B
> EXCEPTIONS FROM COVERAGE
> . . .
>
> PART I
> . . .
>
> This policy does not insure against loss or damage (and [Commonwealth] will not pay costs, attorney's fees or expenses) which arise by reason of
>
> . . .
>
> 4. Master Declaration and Agreement of Easements, Covenants, Conditions and Restrictions between Liberty Mills Limited Partnership and Liberty Mills Residual Limited Partnership dated June 28, 1988 and recorded June 30, 1988 in Deed Book FHS 1111, page 508 ("The Master Declaration"), as Amended by First Amendment to Master Declaration, dated February 5, 1990 and recorded in Deed Book FHS 1576, page 347.
>
> 5. Declaration of Restrictions between Liberty Mills Limited Partnership and PMI Associates dated August 15, 1998 and recorded in Deed Book GHS 1155, page 206, and First Amendment to Declaration of Restrictions between Franklin Mills Associates Limited Partnership and PMI Associates dated December 5, 1989 and recorded December 21, 1989 in Deed Book FHS 1518, page 541.

(Id. at Bates No. 587.)

PMI eventually defaulted on the balance of its loan in 2003 and, in lieu of facing foreclosure proceedings, it conveyed the Property to Nationwide by fee simple deed. (Am. Compl. ¶¶ 19-20; Answer ¶¶ 19-20.) In an effort to recoup its losses, Nationwide attempted to sell the Property to Ironwood Real Estate, LLC ("Ironwood"), who agreed to purchase the property for $3,800,000. (Pl's Mot. Summ. J., Ex. E, Aff. of Jennifer Thrasher ¶ 12, Oct. 18, 2010 ("Thrasher Aff.").) Ironwood was a company that acquired and developed shopping

centers. (Def.'s Mot. Summ. J., Ex. 9, Dep. of Jeremy Fogel, 24:8-22, June 30, 2010 ("Fogel

Dep.").) It sought to lease the space to Lincoln Technical Institute for use as a technical school.

(Id. at 43:21-44:24.) Because Ironwood was a "tenant driven" company, it was only interested in

the Property if it had a user to occupy it. (Id. at 125:10-126:17.) Thus, Nationwide contacted

Franklin Mills to formally request that it (1) execute a waiver of its right of first refusal and

option to purchase the Property and (2) approve Ironwood as the buyer of the Property.

(Thrasher Aff. ¶¶ 16-17.) Franklin Mills, however, invoked its rights under the Declaration of

Restrictions and stated that it did not consent to either the sale of the Property to Ironwoood or

the lease to Lincoln Tech. (Def.'s Mot. Summ. J., Ex. 8, Dep. of Jennifer Thrasher, 36:16-37:14,

42:12-43:11, July 13, 2010 ("Thrasher Dep."); Thrasher Aff. ¶ 18.) As a result, Ironwood

refused to complete its purchase of the property. (Thrasher Aff. ¶ 22; Fogel Dep. 126:8-17.)

Although Nationwide and its local broker Fameco made several more attempts to find buyers

acceptable to Franklin Mills, they were unsuccessful. (Thrasher Aff. ¶¶ 26-27.) Finally,

Nationwide attempted to sell the Property back to Franklin Mills for $1.00 in order to obtain a

release of the duty to pay CAM charges. (Id. ¶ 29; Goodman Dep. 35:7-36:21, 51:2-21.)

Franklin Mills, however, agreed to accept ownership only if Nationwide would pay it an

additional $200,000. (Thrasher Aff. ¶ 30.) Nationwide subsequently made efforts to reduce the

assessed value of the Property for tax purposes, and the City of Philadelphia assigned it a fair

market value of $450,000. (Id. ¶ 32.)

Thereafter, Nationwide submitted a claim for coverage to Commonwealth, alleging that

Franklin Mills's rights of refusal were covered restrictions that made the property unusable and

unsalable. (Am. Compl. ¶ 33; Answer ¶ 33; Thrasher Aff. ¶ 35.) Commonwealth denied the

claim for coverage by letter dated April 13, 2004. (Am. Compl. ¶ 34; Answer ¶ 34; Thrasher Aff. ¶ 37; Pl.'s Mot. Summ. J., Ex. B, Dep. of James Conmy, 47:19-49:12 & Ex. 4, July 14, 2010 ("Conmy Dep.").) In light of its disagreement with the coverage decision, Nationwide initiated a lawsuit against Commonwealth in this Court seeking both a declaratory judgment and money damages. (Compl. ¶¶ 4-5.) Commonwealth filed a motion to dismiss the case in its entirety. On October 19, 2005, the Court dismissed the litigation, holding that, by listing the Declaration of Restrictions under the "Exceptions from Coverage" section in Schedule B of the Policy, the Policy "expressly excepted" any loss or damage arising from that Declaration. Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co., No. CIV.A.05-281, 2005 WL 2761492, at *7 (E.D. Pa. Oct. 19, 2005). Nationwide subsequently sought reconsideration, but the Court denied the motion and further held that Plaintiff Nationwide bore the burden of proper diligence before issuing the mortgage to PMI. Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co., No. CIV.A.05-281, 2006 WL 1192998, at *3 (E.D. Pa. May 3, 2006).

Nationwide appealed to the United States Court of Appeals for the Third Circuit. Originally, the appeal was stayed pending the outcome of another case brought by Nationwide against Franklin Mills claiming that the relevant restrictions in the Declaration were unenforceable. See Compl., Nationwide v. Franklin Mills, No. CIV.A.04-5049 (E.D. Pa. Oct. 27, 2004). That latter case, however, settled without any ruling on the substantive issues. Stipulation of Dismissal, Nationwide v. Franklin Mills, No. CIV.A.04-5049 (E.D. Pa. Feb. 28, 2008). Thereafter, via decision issued January 28, 2009, the Third Circuit reversed the District Court's dismissal of this matter. Nationwide Life Ins. Co. v. Commonw. Land Title Ins. Co., 579 F.3d 304 (3d Cir. 2009). The Appeals Court reinterpreted the Policy considering not only the

text of the contract, but also its purpose and industry custom and practice. Upon doing so, it found that, "[t]o except expressly from ALTA 9 Endorsement coverage a right of refusal or other restrictions noted in paragraph 1(b)(2) of the Endorsement, an insurer must list those restrictions specifically in Schedule B. It is not enough for the insurer merely to list in some part of Schedule B the document in which the restrictions are embedded." Id. at 317 It went on to hold that, "Commonwealth bore the burden of detecting the restrictions stated in the Declaration, and had to list those restrictions explicitly as exceptions to avoid covering loss from them." Id. at 319.

Under Third Circuit mandate, the parties returned to this Court. Plaintiff filed a First Amended Complaint on November 12, 2009, alleging claims for breach of contract, bad faith, and a declaratory judgment. (Am. Compl. ¶¶ 48-57.) The parties have now completed discovery and filed the current Cross-motions for Summary Judgment.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party. Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.

Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)). Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for

summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue.  Anderson, 477 U.S. at 249-50.

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    DISCUSSION

The parties' Cross-motions for Summary Judgment raise a multitude of common issues that bear equally on their merits.  Accordingly, in lieu of engaging in a separate – and likely duplicative – discussion of the two Motions, the Court addresses their commonly raised issues in joint fashion, remaining cognizant of each party's individual burden of proof.

### A.    Whether the Law of the Case Doctrine Forecloses Commonwealth's Argument that the ALTA 9 Covers Only Certain Limited Provisions

Prior to reaching the substantive dispute regarding the meaning of the Policy in this case, the Court must confront the preliminary – and perhaps most contentious – issue of whether Defendant's contract interpretation is barred by the "law of the case" doctrine.  Although the Court engaged in a cursory discussion of this topic when ruling upon Plaintiff's Motion in Limine to exclude Defendant's expert's report, a more thorough review of the issue is warranted given the parties extensive summary judgment briefing.

"The 'law of the case' doctrine reflects courts' general reluctance to reconsider matters soundly decided." Falor v. G & S Billboard, No. CIV.A.04-2373, 2008 WL 5190860, at *2 (D.N.J. Dec. 10, 2008). "The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity." In re City of Philadelphia Litig., 158 F.3d 711, 717-18 (3d Cir. 1998). It provides that "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." In the Matter of Resyn Corp., 945 F.2d 1279, 1281 (3d Cir. 1991) (quotations omitted). In other words, "once an issue has been decided, parties may not relitigate that issue in the same case." Waldorf v. Shuta, 142 F.3d 601, 616 n.4 (3d Cir. 1998).

With this well-established proposition, however, comes the equally well-settled corollary that a trial court "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943, 950 (3d Cir. 1985). Thus, the trial court is "free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." Id.; see also Resyn Corp., 945 F.2d at 1282 (noting that issues raised but not reached on a prior appeal are not within the law of the case doctrine). Moreover, it is abundantly clear that "[t]he doctrine does not apply to dicta." United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa., 316 F.3d 392, 397 n.4 (3d Cir. 2003). Thus "[g]ratuitous statements in an opinion that do not implicate the adjudicative facts of the case's specific holding do not have the bite of precedent. They bind neither coordinate nor inferior courts in the judicial hierarchy. They are classic *obiter dicta*: 'statement[s] of law in the opinion

which could not logically be a major premise of the selected facts of the decision.'" U.S. v. Warren, 338 F.3d 258, 265 (3d Cir. 2003) (quotations omitted).[2]

As set forth above, Defendant denied coverage for Plaintiff's claim and subsequently moved to dismiss the lawsuit against it on the ground that loss arising from the Master Declaration and Declaration of Restrictions was "expressly excepted" under the terms of the Policy. Although this Court originally agreed with that argument, the Third Circuit reversed and remanded the case. In lieu of further challenging the Third Circuit's interpretation of "expressly excepted," Defendant currently contends that the ALTA 9 Endorsement never extended coverage in the first place to Plaintiff's loss. It explains that the ALTA 9 Endorsement in the Policy only provides insurance for loss or damage if an instrument – like the Master Declaration or the Declaration of Restrictions –  contains direct restraints on alienation such as an option to purchase, a right of first refusal, or a right of approval of a future purchaser, and if the claimed damage or loss results directly from such provisions. According to Defendant, Nationwide suffered no such harm on account of any such right contained in either the Master Declaration or the Declaration, but rather only from the use restrictions – also known as indirect restraints on

_____

[2] Notably, this doctrine "is a rule that is subject to the discretion of the court applying it." Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 988 F.2d 414, 429 (3d Cir. 1993). "The law-of-the-case doctrine does not limit the jurisdictional power of trial judges to reconsider issues previously decided by a predecessor judge from the same court, but it does recognize, as a matter of comity, that a successor judge should not lightly overturn the decision of his predecessor in a given case." United States v. Wecht, 619 F. Supp. 2d 213, 222 (W.D. Pa. 2009) (citing Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir. 1994)). "Accordingly, it has been said that a matter previously ruled upon should be revisited only in 'extraordinary circumstances,' as where, e.g.: 1) the predecessor judge is unavailable; 2) new evidence becomes available; 3) a supervening new law has been announced; or 4) the earlier decision was clearly erroneous and would create manifest injustice." Id.

alienation – within those documents. In turn, it concludes that such use restrictions are not covered under the ALTA 9 Endorsement.

Plaintiff now insists that the entire meaning of the ALTA 9 Endorsement has been fully and conclusively determined by both this Court's ruling on the Motion to Dismiss and the Third Circuit's subsequent decision. It argues that both opinions expressly noted that the ALTA 9 Endorsement covers the entirety of the instruments at issue in this case, from which the claimed damage to Nationwide's property interest arose. According to Plaintiff, any contrary interpretation is foreclosed by the law of the case doctrine.

This argument, however, fails in multiple respects. First, this Court made no essential holding regarding the ALTA 9 Endorsement's scope of coverage when granting the motion to dismiss. Moreover, the Third Circuit's decision was clearly limited to an interpretation of the phrase "expressly excepted" within the ALTA 9 Endorsement. Finally, any commentary by the Third Circuit as to the proper interpretation of the ALTA 9 Endorsement's scope of coverage was nothing more than *dicta* not covered by the law of the case doctrine. The Court expands upon each of these bases below.

1. **The District Court Made No "Essential Holding" that the ALTA 9 Endorsement Provides Coverage for an Instrument Referred to Schedule B**

Plaintiff initially claims that the District Court, in ruling on the Motion to Dismiss, found that "[t]he ALTA 9 Endorsement provides coverage for an instrument referred to in Schedule B, if that instrument provides for an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant, *unless* that instrument is expressly excepted in Schedule B."

14

Nationwide Life Ins. Co., 2005 WL 2716492, at *7 (emphasis in original).  Highlighting the first

phrase of that sentence – "[t]he ALTA 9 Endorsement provides coverage for an instrument

referred to in Schedule B" – Plaintiff argues that "[t]his essential holding was not disturbed by

the court of appeals."  (Pl.'s Resp. Def.'s Mot. Summ. J. 3.)

Such an argument constitutes a misreading of the Court's opinion and disregards the

context in which the statement was made.  Defendant's brief in support of its motion to dismiss

argued that "*even if* the Declaration is 'an option to purchase, right of first refusal, or prior

approval of a future purchaser or occupant,' under the first prong of the test, it is 'expressly

excepted by Schedule B,' under the second prong of the test, and therefore, is not afforded

coverage under the ALTA 9 Endorsement."  Nationwide Life Ins. Co., 2005 WL 2716492, at *6

(emphasis added).  This Court proceeded under this same assumption regarding the scope of the

ALTA 9 Endorsement's coverage and then dismissed the case solely on the grounds that the

Declaration had, in fact, been "expressly excepted" by Schedule B.  Id. at *7.  Clearly, this Court

made no ruling on the present scope of coverage issue which the Third Circuit could either affirm

or leave undisturbed.

## 2. The Third Circuit Expressly Limited Its Holding to a Determination of the Words "Expressly Excepted"

That same restriction of holding equally applies to the Third Circuit's decision.  Given

the limited bounds of the District Court's opinion, the only issue before the Court of Appeals was

the meaning of the words "expressly excepted," a fact which it explicitly acknowledged at the

very outset of its opinion, as follows:

To decide this case, we interpret the standard-form policy drafted by the American Land Title Association ("ALTA") and used by Commonwealth. In particular, we determine what a title insurer must do to except restrictions from coverage under a specific endorsement to the policy. The District Court held that an insurer can do so merely by listing in a schedule of exceptions to the policy the document in which the restrictions are found. Because we believe that an insurer must list the actual restriction in such a schedule to except them, we reverse.

Nationwide, 579 F.3d at 306.

Thereafter, the Third Circuit spent the substance of its opinion reviewing the meaning of the term "expressly excepted," while effectively disregarding the merits of Commonwealth's footnote argument that the ALTA 9 Endorsement covers only prior-approval-of-future-purchaser restrictions, and not use restrictions. Indeed, via the very first footnote to the opinion, the Third Circuit remarked:

Commonwealth disputes that the Declaration contains a prior-approval-of-future - purchaser restriction, arguing instead that Nationwide seeks simply to evade the Declaration's use restrictions. Commonwealth accepts, however, that because this case was decided at the motion to dismiss stage in the District Court, the allegations in Nationwide's complaint "must be accepted as true for purposes of this appeal."

Id. at 306 n.1. As such, the Third Circuit proceeded on the same assumption as Commonwealth that such coverage existed unless "expressly excepted" by Schedule B. Upon engaging in a thorough discussion of the text and purpose of the policy, as well as industry custom associated with the ALTA 9 endorsement, the Court of Appeals ultimately held that:

To except expressly from ALTA 9 Endorsement coverage a right of refusal or other restrictions noted in paragraph 1(b)(2) of the Endorsement, an insurer must list those restrictions specifically in Schedule B. It is not enough for the insurer merely to list in some part of Schedule B the document in which the restrictions are embedded. Commonwealth thus failed to "expressly except[]" from ALTA 9

> Endorsement coverage loss from the restrictions contained in the Declaration, and
> should cover Nationwide's claim.

Id. at 317. Via this finding, the Third Circuit determined, not that the ALTA 9 Endorsement

extended coverage to the loss, but only that "[w]hen Commonwealth issued its title insurance

policy to Nationwide, it failed to except expressly the restrictions contained in the Declaration

under paragraph 1(b)(2) of the policy's ALTA 9 Endorsement." Id. at 319. It is this holding to

which the law of the case doctrine applies.

### 3. The Third Circuit's Commentary as to the Scope of Coverage of the ALTA 9 Endorsement Was Nothing More than Dicta

Despite the strict confines of the appellate decision, Plaintiff references multiple passages

from that opinion that comment on both the ALTA 9 Endorsement's scope of coverage and

whether paragraph 1(b)(2) of that Endorsement expressly provided title coverage for the

restrictions that caused damage to Nationwide. According to Plaintiff, the following statements

by the Third Circuit constitute binding holdings:

> Because Franklin Mills based its refusal on the Declaration's restrictions,
> Commonwealth's calling them another name – use restrictions rather than a prior-
> approval-of-future purchaser restriction or some other right of refusal, see supra
> nn.1 & 2 – is irrelevant. Though we need not decide whether use restrictions
> necessarily are restrictions on the approval of future purchasers of property, they
> are deemed so here because that is the practical effect of Franklin Mills's actions
> in this case. (In any event, use restrictions are, like prior-approval-of-future-
> purchaser restrictions, among the important items of information lenders and
> owners seek in obtaining title insurance policies).

Nationwide, 579 F.3d at 306 n.3.

[We] hold that paragraph 1(b)(2) of the ALTA 9 Endorsement extends coverage to loss from an instrument in either part of Schedule B unless the insurer takes express exception to the specific restrictions stated in the instrument.

Id. at 311.

[B]ecause the Declaration is an "instrument referred to in Schedule B as containing . . . restrictions on the land which . . . provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant," loss arising from it is covered under paragraph 1(b)(2) of the ALTA 9 Endorsement "[u]nless expressly excepted in Schedule B."

Id. at 309-10.

In sum, the text, purpose, and industry usage of the ALTA 9 Endorsement convince us that the District Court erred in granting Commonwealth's motion to dismiss. . . . Commonwealth thus failed to "expressly except[ ]" from ALTA 9 Endorsement coverage loss from the restrictions contained in the Declaration, and should cover Nationwide's claim.

Id. at 317.

When taken in such isolated form, these passages create the deceptive appearance that the Third Circuit definitively ruled on the current issues of coverage. Reading them in the context of the entire opinion, however, this Court finds them to be classic *obiter dicta*. As to the first quoted passage, it was made in a footnote within the "Factual and Procedural Background" section of the opinion with no case citation, evidentiary sources, or reference to industry treatises. In addition, the Court placed a caveat on its remark, noting that it "*need not decide* whether use restrictions necessarily are restrictions on the approval of future purchasers of property." Id. at 306 n.1 (emphasis added). Such precatory statements, which are "not necessary to the actual holding of the case," are "properly considered dicta, and are not binding." Kool, Mann, Coffee &

Co. v. Coffey, 300 F.3d 340, 355 (3d Cir. 2002); see also In re Conston, Inc., 181 B.R. 769, 774-75 (D. Del. 1995) (noting that while dicta may be "instructive as to the position of a particular appellate panel, it is not binding on the lower Court").

The next three remarks are similarly consistent with only the appellate court's holding that to remove a restriction from ALTA 9 coverage, the insurer must "expressly except" it in Schedule B. As indicated above, at the outset of the opinion, the Third Circuit expressly noted that Commonwealth assumed, solely for purposes of deciding the "expressly excepted" issue, that the ALTA 9 Endorsement covered the restrictions contained in the Declaration. Nationwide, 579 F.3d at 306 n.1. Thereafter, prior to starting any substantive discussion of the case, the Third Circuit made clear that "*[f]or purposes of our opinion,* 'restrictions' include defects in title, liens, easements, encumbrances, conditions and covenants (such as the rights at issue in this case) affecting the insured property." Id. at 308 n.4 (emphasis added). In doing so, it offered no legal interpretation of paragraph 1(b)(2) of the ALTA 9 Endorsement and made no statement or implication that this assumption became part of its holding or mandate. Working under the assumption that the ALTA 9 Endorsement provided insurance coverage for the restrictions affecting the encumbered Property, the Third Circuit then proceeded to discuss the meaning of "expressly excepted." Accordingly, the above-mentioned remarks were made solely for the purpose of emphasizing what an insurer must do to expressly except a right of refusal or other restriction from ALTA 9 Endorsement coverage.

This interpretation of the Third Circuit's comments finds ample support in the procedural posture of the case and the briefing presented to the Third Circuit. As repeatedly discussed, the case was originally dismissed by the District Court at the earliest stages of the litigation without

any discovery and based on a very limited issue. In its opening brief to the Third Circuit, Plaintiff focused solely and entirely on whether the District Court's interpretation of the phrase "expressly excepted" was proper, without any argument as to whether the ALTA 9 Endorsement covered the rights at issue. (Nationwide's Opening Br., App. No. 06-2890.) Defendant's responsive brief followed suit by focusing on the identical issue. Although Defendant raised its scope-of-coverage argument by way of a footnote, it conceded that "[b]ecause the allegations of the Complaint must be accepted as true for purposes of this appeal . . . whether or not a right of first refusal, an option to purchase, or approval of a future purchaser is really at issue *does not affect the question for resolution by this Court on appeal*." (Commonwealth Opening Br., App. No. 06-2890, at 4 n.2 (emphasis added).) Plaintiff did not contest this statement in its subsequent briefs and did not discuss the scope of ALTA 9 coverage. Ultimately, the appellate court had before it no evidence or legal argument to assist with an independent determination of such an issue. As neither party raised, researched, or briefed this issue on appeal, the Third Circuit clearly could not have intended that its gratuitous comments regarding the scope of the ALTA 9 Endorsement would constitute the law of the case.[3]

---

[3] In its Motion for Summary Judgment, Nationwide argues:

> The court of appeals further wrote that "because the Declaration [of Restrictions] is an '*instrument* referred to in Schedule B as containing . . . restrictions on the land which . . . provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant loss' arising from *it* is covered under paragraph 1(b)(2) of the ALTA 9 Endorsement." Id. at 310 (emphasis added). Thus, the language of the ALTA 9 as recognized by the mandate of the court of appeals, requires only that Nationwide prove it was damaged by an instrument, not by a specific provision in the instrument.

(Pl.'s Mem. Supp. Mot. Summ. J. 15.) Plaintiff's quotation of the Third Circuit, however, leaves off the closing language of the sentence, stating "[u]nless expressly excepted in Schedule B."

Finally, the Third Circuit's mandate to this Court is inconsistent with the notion that it ruled on the proper interpretation of the ALTA 9 Endorsement's scope of coverage. Plaintiff seizes on the appellate court's language that "Commonwealth thus failed to 'expressly except[ ]' from ALTA 9 Endorsement coverage loss from the restrictions contained in the Declaration, *and should cover Nationwide's claim*." Nationwide, 579 F.3d at 317 (emphasis added). This highlighted comment, however, was made solely in the context that to the extent Commonwealth denied coverage based solely on the "expressly excepted" provision, it erred in its coverage decision. The Third Circuit neither found that Nationwide was entitled to judgment on its Complaint nor remanded only for a calculation of damages. Rather, it simply reversed the District Court's dismissal of the case and remanded "for further proceedings consistent with this opinion." Id. at 319. Had the Third Circuit wished to conclusively decide all issues of coverage, it would have said so.

In short, the Court agrees that the Third Circuit's opinion as to the meaning of "expressly excepted" now constitutes the law of the case. To the extent, however, that the Third Circuit casually commented on any additional matters – particularly whether the ALTA 9 Endorsement extended coverage to the restrictions at issue in this case – this Court deems such statements non-binding *dicta*.

**B.     Whether Nationwide Has Suffered Loss or Damage on Account of Rights Covered by the Policy**

---

Nationwide, 579 F.3d at 510. This closing phrase is crucial because it was that point that the Third Circuit was emphasizing and ultimately holding. The previous statement about the Declaration being an instrument covered by paragraph 1(b)(2) of the ALTA 9 Endorsement was part of the Third Circuit's initial assumptions and was not based on any legal briefing or other finding by the Court.

Having found that the law of the case doctrine does not dictate the scope of coverage under the ALTA 9 Endorsement, the Court turns to the first substantive issue between the parties – whether Nationwide's loss was ever covered under the ALTA 9 Endorsement to the Policy. Commonwealth, on the one hand, argues that it was not Franklin Mills's right to approve *who* purchases the Property that has been the source of Nationwide's alleged inability to sell or lease the Property. Rather, it is the fact that no proposed *use* of the Property has conformed with the Declaration of Restrictions. Because the ALTA 9 Endorsement allegedly covers only loss or damage that arises from the invocation of direct restraints on alienation, such as the prior-approval-of-future-purchaser restrictions, and not from the existence of a use restriction, the Policy does not insure Nationwide's alleged loss. Nationwide, on the other hand, counters that the ALTA 9 Endorsement covers the entirety of the encumbrances and restrictions contained within the Master Declaration and the Declaration of Restrictions. As these two documents encompass both use and prior approval of future purchaser restrictions, and as Nationwide suffered damages from each type of encumbrance, it claims that it is entitled to coverage under the Policy.

Resolution of these competing positions requires consideration of three main questions: (1) what type of restrictions or encumbrances are covered by paragraph 1(b)(2) of the ALTA 9 Endorsement; (2) whether the Declaration of Restrictions falls within the ALTA 9 Endorsement's scope of coverage, and (3) whether Nationwide's losses, *i.e.* its inability to sell the Property, was occasioned by items within the scope of ALTA 9 coverage. The Court takes each inquiry in turn.

### 1. The ALTA 9 Endorsement's Scope of Coverage

Our first inquiry examines the purely legal question of the scope of coverage of paragraph 1(b)(2) of the ALTA 9 Endorsement. As noted above, Defendant contends that paragraph 1(b)(2) only provides coverage for prior-approval-of-future-purchaser restrictions, which are entirely separate from use restrictions. In support, it cites to its expert J. Bushnell Nielsen,[4] who opined that "the custom and practice in the land title industry is to classify a purchaser approval right, option to purchase or right of first refusal as a direct restraint on alienation which is a condition to the grant of title, and to classify use restrictions as encumbrances on title, which are indirect restraints only." (Def.'s Resp. Mot. in Limine, Ex. A, Report of J. Bushnell Nielsen, 10 ("Nielsen Report").) Mr. Nielsen further found, based on the "custom and practice in the land title industry," that "paragraph 1(b)(2)'s reference to an option to purchase, right of first refusal or right to approve a purchaser or occupant is a reference to restraints on alienation that are not use restrictions. This assurance of the ALTA 9 Endorsement indemnifies the insured against loss suffered due to the existence of any such rights that are 'in addition' to the use restrictions excepted in Schedule B." (Id. at 11-12.)

Defendant's limited interpretation, however, is undermined by basic tenets of contract jurisprudence. In Pennsylvania, "the interpretation of insurance contracts is a question of law that properly may be decided by the court rather than a jury." Gamble Farm Inn, Inc. v. Selective Ins. Co., 656 A.2d 142, 143 (Pa. 1995). If possible, a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions. Pellegrino Food Prods. Co., Inc. v. Am.

_____

[4] Although Plaintiff continues to dispute the admissibility of Mr. Nielsen's expert report, this Court conclusively ruled, on January 20, 2011, that all but Sections I and II of the "Opinions" section of Mr. Nielsen's report was admissible. Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co., No. CIV.A.05-281, 2011 WL 204619 (E.D. Pa. Jan. 20, 2011).

Auto. Ins. Co., 655 F. Supp. 2d 569, 575 (W.D. Pa. 2008). The Pennsylvania Supreme Court has frequently reiterated the principle that extrinsic evidence of the intent of parties to a contract may be utilized by a court to interpret ambiguous language. Hutchison v. Sunbeam Coal Corp., 519 A.2d 385 (Pa. 1986) (citing Herr Estate, 161 A.2d 32, 34 (Pa. 1960)). In the context of insurance policies, "[w]here a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. . . . Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983); see also Bateman v. Motorists Mut. Ins. Co., 590 A.2d 281, 283 (Pa. 1991).

It is well-established that in construing the terms of a contract, the court must read the contract in its entirety, giving effect to all of the contractual language if at all possible. Whole Enchilada, Inc. v. Truckers Prop. Cas. Co. of Am., 581 F. Supp. 2d 677, 690 (W.D. Pa. 2008). "The Court should not consider individual terms removed from their context, but should instead consider the entire contractual provision to determine the intent of the parties." NorFab Corp. v. Travelers Indem. Co., 555 F. Supp. 2d 505, 509 (E.D. Pa. 2005). In addition, "[n]o provision within a contract is to be treated as surplusage or redundant if any reasonable meaning consistent with the other parts can be given to it." Sparler v. Fireman's Ins. Co. of Newark, N.J., 521 A.2d 433, 438 n.1 (Pa. Super. Ct. 1987).

Applying such principles, the Court finds that the language of the ALTA 9 Endorsement is clear and unambiguous. As repeatedly set forth above, the relevant portion of the ALTA 9 Endorsement states that Commonwealth insures Nationwide

against loss or damage sustained by reason of . . . [t]he existence at Date of Policy of . . . [a]ny instrument referred to in Schedule B as containing covenants, conditions, or restrictions on the land which, in addition, (i) establishes an easement on the land; (ii) provides a lien for liquidated damages; (iii) provides for a private charge or assessment; (iv) provides for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.

(Def.'s Mot. Summ. J., Ex. 2, at ALTA 9 Endorsement ¶ 1(b)(2).)  A plain reading of this language indicates that it covers against loss sustained by reason of the existence of "an instrument referred to in Schedule B," which, in this case, could be either the Declaration of Restrictions or the Master Declaration.  For that "instrument" to be covered, it must further contain (1) covenants, conditions, or restrictions on the land, as well as (2) an easement on the land, a lien for liquidated damages, a private charge or assessment, an option to purchase, a right of first refusal, or a prior approval of a future purchaser or occupant.  Any loss arising as a result of any portion of that instrument – and not from any particular provision contained therein – falls within the scope of the ALTA 9 Endorsement coverage.[5]

Defendant's contrary argument, as bolstered by Mr. Nielsen's Report, simply reads out of the provision the phrase "instrument referred to in Schedule B."  Indeed, while spending an inordinate amount of time defining industry custom and practice as to the meaning of "covenants, conditions, and restrictions" and clarifying the difference between direct restraints on alienation and indirect restraints on alienation, Mr. Nielsen seems to completely disregard the term "instrument" in favor of a finding that the Endorsement coverage is limited to particular types of

---

[5]  Plaintiff's report from its expert, Stuart Ebby, reaches the same conclusion.  Nonetheless, Mr. Ebby's opinion references no sources and appears to be only an inadmissible conclusion of law that attempts to apply the Policy terms to Nationwide's loss.  Accordingly, it does not factor into the Court's legal interpretation of the Policy.

restrictions.[6]  By its plain language, however, the Endorsement only defines what types of

instruments are covered and then clearly insures against *any loss* sustained from the *instrument*

itself.  Had the Endorsement meant otherwise, it would have eliminated the language "any

instrument" and simply insured Nationwide against loss resulting from any "covenants,

conditions, or restrictions on the land [referred to in Schedule B] which, in addition . . . provide[]

for an option to purchase, a right of first refusal or the prior approval of a future purchaser or

occupant."  In such a case, Mr. Nielsen's conclusion that the Endorsement covered only direct

restraints on alienation that are not use restrictions would become relevant.  Because the Court

must give effect to all contractual language, however, Mr. Nielsen's interpretation does not

withstand judicial scrutiny.[7]

---

[6]  In the opinion on Plaintiff's Motion in Limine, the Court expressly ruled that Mr. Nielsen's legal conclusions were precluded from consideration during summary judgment review. Nationwide Life Ins. Co. v. Commw. Land Title Ins. Co., No. CIV.A.05-281, 2011 WL 204619, at *13-15 (E.D. Pa. Jan. 20, 2011)  Thus, to the extent Mr. Nielsen attempts to interpret the scope of the Endorsement based on its language, rather than simply opine on the meaning of certain words or phrases under industry custom and practice, his opinion is a conclusion of law, which is inadmissible under the Federal Rules of Evidence.  See Smith v. Cont'l Cas. Co., No. CIV.A.07-1214, 2008 WL 4462120, at *1 (E.D. Pa. Sep. 30, 2008) (recognizing that expert testimony as to industry customs and practice may be helpful so long as expert does not engage in legal construction of insurance policy terms), aff'd, 347 Fed. Appx. 812 (3d Cir. 2001).

[7]  Alternatively, Defendant makes the policy argument that, "[i]f Nationwide is correct in its reading of the Policy, a title insurer would be obligated to provide coverage for any and all encumbrances in an instrument expressly excepted on Schedule B if that title insurer failed to identify even a single ALTA 9 (1)(b)(2) encumbrance.  This is not how Schedule B and ALTA 9 were intended to operate.  Such a rule would render title insurance policies prohibitively cumbersome documents and essentially meaningless as a result."  (Def.'s Reply Supp. Mot. Summ. J. 4-5.)  The Court is unswayed by this contention.  As the Third Circuit has expressly held, title insurance companies should bear "the burden of detecting the restrictions stated in the declaration" and "list[ing] those restrictions explicitly as exceptions to avoid covering loss from them."  Nationwide, 579 F.3d at 319.  Under this principle, it would be reasonable for the ALTA 9 Endorsement to fully cover listed instruments and then place the burden on the title insurance company to explicitly except out the provisions of those instruments they wish to avoid covering.

In short, the Court finds that the ALTA 9 Endorsement provides insurance coverage for any loss arising from any instrument referenced in Schedule B that contains both covenants, conditions, or restrictions, as well as, among other items, an option to purchase, a right of first refusal, or a prior approval of a future purchaser or occupant. The Endorsement does not restrict its coverage to specific provisions within such instruments.

## 2. Whether the Declaration Falls Within ALTA 9's Scope of Coverage

The second step in the coverage inquiry is whether the Declaration of Restrictions falls within the scope of the ALTA 9 Endorsement. As noted above, to come within the Endorsement's bounds, the instrument must contain "covenants, conditions or restrictions on the land" and must provide for an easement on the land, a lien for liquidated damages, a private charge or assessment, or an option to purchase, a right of first refusal, or the prior approval of a future purchaser or occupant. No genuine issue of material fact exists on these points.

As to the "covenants, conditions, or restrictions on the land,"[8] the Pennsylvania Supreme Court has defined a restrictive covenant as "a private agreement, usually in a deed or lease, that restricts the use or occupancy of real property, especially by specifying lot sizes, building lines, architectural styles, and the uses to which the property may be put." Vernon Twp. Volunteer Fire Dept. Inc. v. Connor, 855 A.2d 873, 875 n.2 (Pa. 2004) (citing BLACK'S LAW DICTIONARY 371

---

[8] Notably, Mr. Nielsen opines that, under industry custom and practice, the phrase "covenants, conditions or restrictions" in the ALTA 9 Endorsement refers only to use restrictions. (Nielsen Report 10.) Plaintiff has disputed this conclusion on the ground that Pennsylvania law uses the terms "covenants," "conditions," and "restrictions" interchangeably to refer to a wide variety of real estate encumbrances. (Pl.'s Mem. Supp. Mot. in Limine 8-9 (citing cases).) For purposes of this opinion only, the Court takes Mr. Nielsen's definition of "covenants, conditions or restrictions" as true.

(7th ed. 1999)).  The Restatement provides that "[a]n otherwise invalid servitude is valid even if it indirectly restrains alienation by limiting the use that can be made of property, by reducing the amount realizable by the owner on sale or other transfer of the property, or by otherwise reducing the value of the property."  RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 3.5 (2000); see also J.C. Penney Co., Inc. v. Giant Eagle, Inc., 813 F. Supp. 360, 368 (W.D. Pa. 1992) (holding that restrictive covenants are presumptively valid and enforceable).  "Unlike direct restraints on alienation, which directly interfere with the process of conveying land, and have long been understood and constrained by the common law, indirect restraints may have no overall negative effects on the wealth of a society overall or more narrowly, on the value of its land resources.  On the contrary, they may result in an overall increase in wealth."  RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 3.5 cmt. a.  "The only requirement is that there be a rational justification for creating it as a servitude."  Id.  Importantly, "[r]estrictive covenants that 'run with the land' bind subsequent owners of the property, and property purchasers have a duty to become aware of recorded restrictions in the chain of title even absent actual notice."  Greens at Greencastle Ltd. P'ship v. Greencastle GIBG LLC, No. CIV.A.06-1708, 2009 WL 3182841, at *3 (M.D. Pa. Sept. 28, 2009).

Direct restraints on alienation, on the other hand, "include absolute prohibitions on some or all types of transfers, including leases, *prohibitions on transfer without the consent of another*, prohibitions on transfer to particular persons, requirements of transfer to particular persons, options to purchase land, and rights of first refusal."  RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 3.4 cmt. b (2000) (emphasis added).  Whereas indirect restraints on alienation (*i.e.* use restrictions) are valid unless they lack a rational basis, "[d]irect restraints on alienation . .

. are valid only if reasonable." Id. "The test for direct restraints is more stringent because they clearly interfere with the process of conveying land and have long been subjected to common-law controls, which often have been more stringent than a reasonableness test." Id. § 3.4 cmt. b. "A prohibition on transfer of property without the consent of another is an unreasonable restraint on alienation unless there is strong justification for the prohibition, and, unless the consent can be withheld only for reasons directly related to the justification for the restraint." Id. cmt. d.

The Declaration of Restrictions in this case undoubtedly contains both types of encumbrances. First, the Court finds – and Commonwealth expressly admits – that the Declaration encompasses use restrictions/indirect restraints on alienation. The Declaration itself states as follows:

> 2. Use Restrictions and Operating Covenant.
>
> A) Use. Subject to the provisions of this Sub-paragraph 2(A), Buyer shall use and occupy the Property (and the building to be constructed thereon) only for the purposes of a variety or general merchandise store.

(Def.'s Mot. Summ. J., Ex. 6, at 6.) The provisions following this paragraph then specify the products and merchandise to be displayed and offered for sale and other usages of the Property prior to the expiration of the three year Operating Covenant. (Id.) Upon the expiration of that Operating Covenant period, the Declaration goes on to indicate that:

> Buyer shall have the right to use the Property and/or the building for any single retail use which is (1) permitted under all applicable laws, ordinances, orders, rules, regulations and requirements of all governmental authorities having jurisdiction over the Shopping Center Project, (2) consistent with and permitted under the Master Declaration, and (3) compatible with an enclosed super-regional discount specialty retail shopping center (or such other type of shopping center as

may be operated by Seller within the Shopping Center Project in the future); provided, however, *that in no event shall Buyer use the Property and/or the building for any of the purposes listed on Exhibit 3, attached hereto and made a part hereof; and provided further, however, that Buyer shall not change the use of the Property from a variety or general merchandise store (as described above) without the prior written consent of Seller* (which shall not be unreasonably withheld or delayed if the proposed use satisfies the foregoing requirements of this sentence.  In no event shall the Property be used or occupied for any purposes or in any manner other than as set forth in this Sub-paragraph 2(A) [indicating that the Property shall be used to sell health and beauty aids, pharmaceuticals, video tapes, video cassettes, video disks, and other such pre-recorded video products].

(Id. at 6-7 (emphasis added).)  As Commonwealth expressly concedes, this language "unquestionably deals with how the Property can be used, not who can use the Property."  (Def.'s Mem. Supp. Mot. Summ. J. 23.)

Moreover, the Declaration of Restrictions unequivocally contains a right-of-approval-of-future-purchaser restriction.[9]  Specifically, paragraph 7(c) states that:

Except as provided in this Sub-paragraph 7(c), no sale, transfer or conveyance by Buyer of all or any part of the Property (or any interest therein and/or improvements thereon) shall be deemed to release Buyer from any of its obligations under this Declaration.  If, after the expiration of Buyer's covenant to operate its building as provided in Paragraph 2 above, Buyer sells, transfers or conveys the Property in its entirety (together with all improvements thereon and any easements and appurtenances thereto), Buyer shall be released from all liability under this Declaration and cease to be a party hereto from and after the date upon which the transferee shall become liable for the terms, conditions, covenants and agreements in this Declaration thereafter to be kept, observed and performed by Buyer, but only on the condition that:

---

[9]  Plaintiff argues that the Declaration of Restrictions also contains a "private charge or assessment" in the form of CAM charges, also bringing it within the coverage of paragraph 1(b)(2)(iii) of the ALTA 9 Endorsement.  As the Court finds that the Declaration already falls within paragraph 1(b)(2)(iv) of the Endorsement, we need not reach the merits of this contention. Nevertheless, the availability of CAM charges as insurable policy losses is discussed later in this opinion.  See infra § III.D.4.

<blockquote>
(1)      All of the provisions of sub-sections (i) through (iii) of Sub-paragraph 7(B) above are complied with by Buyer and transferee; and

(2)      The transferee, any general partner of the transferee (if the transferee is a partnership) or any guarantor of the transferee (which guarantor executes a guaranty in favor of Seller that is reasonably satisfactory, in form and substance, to Seller) has a net worth (according to its published, audited financial statement, or according to a statement certified to Seller by an independent certified public accountant) of at least Five Million Dollars ($5,000,000.00) for its most recently completed fiscal year, and is reasonably experienced in the operation of a retail store similar to that which Buyer is required to operate (or cause to be operated) pursuant to Paragraph 2 above.
</blockquote>

(Def.'s Mot. Summ. J., Ex. 6, 19-20, ¶ 7(c).)  Defendant admits that this provision provides Franklin Mills with "the right to disapprove a prospective purchaser of the Property if that purchaser or 'any general partner . . . or any guarantor of the [purchaser]' has a net worth of less than five million dollars or lacks sufficient retail experience."  (Def.'s Mem. Supp. Mot. Summ. J. 24-25.)

Finally, the Declaration of Restrictions includes an option to purchase, which states in pertinent part:

<blockquote>
If at any time after the expiration of Buyer's three (3) year covenant to operate its building as provided in Sub-paragraph 2(B) above, Buyer or any occupant of the Property desires to cease conducting business to the public in its building on the Property, then Seller may, at its sole option, repurchase the Property in the same manner as indicated in Sub-paragraph 2(D) above . . . with the sole exception that the Property shall be repurchased by Seller for a sum equal to the appraised fair market value of the Property (as defined in Sub-paragraph 2(F) below).
</blockquote>

(Def.'s Mot. Summ. J., Ex. 6, 10, ¶ 2(E).)

Given the evidence before the Court – as well as Commonwealth's corroborating admissions – the Court finds that the Declaration of Restrictions falls within the scope of ALTA 9 Endorsement coverage.

### 3. Whether Plaintiff Suffered Any Damages Due to Provisions Within the Declaration of Restrictions

Finally, the Court must determine whether Plaintiff has in fact suffered any "loss or damage sustained by reason of" the Declaration of Restrictions. The Court again finds no genuine issue of material fact precluding a summary judgment ruling on this question.

Both parties agree that Nationwide had identified Ironwood as a potential purchaser of the Property. Further, all evidence of record suggests that Franklin Mills expressly relied on the provisions of the Declaration of Restrictions to thwart Nationwide's sale to Ironwood. Specifically, Jeremy Fogel, Ironwood's president, noted that the provisions of the Declaration of Restrictions – including use, prior approval, and option to repurchase restrictions – were the catalyst behind the failed Nationwide/Ironwood transaction:

> Q. Okay. And if you look at Paragraph 1 [of an exhibit e-mail], and down at the bottom of the page and David McLaughlin's E mail, it says, "I don't think we can be any more specific about the nature of the amendments at this time. Preliminarily, we need to know Liberty Mills' position on the purchase option issues before we can begin addressing the use restrictions." Do you know why he put the purchase options – purchase option issues ahead of the use restriction issues?
>
> A. Because I think we were well-aware that the use restriction would require some sort of sales pitch to the Mills, and if they were going to elect to purchase the property, what was the point of getting that preparation in place? So, in this case, in a linear manner we wanted to first make sure

that Mills would waive its rights.  If they would, then we would go address the use issues.

Q.    Okay.  So, if Mills didn't waive rights to repurchase the property, then there was no reason to proceed forward?

A.    That's correct.

(Fogel Dep. 137:25-138:2.)

Q.    In order to go forward with your deal did you understand that the Mills Corp had to approve Lincoln Tech as your tenant?

A.    I think the answer's the same as the prior, I believe, the documents clearly gave that use as a restricted use, or it wasn't listed as the approved uses, so we made the assumption that the Mills would have to approve it as a use.

. . .

Q.    Now, in this deal, were you asking, was Nationwide or you, asking Mills to approve the use of the property as a school, or were you asking them to approve, specifically approve, the occupation of the space by the tenant, Lincoln Tech?

A.    They would be the same thing to me.  We would be asking for the Mills to agree to have Lincoln Tech occupy the space for their intended use.

Q.    Okay.

A.    If they – actually, looks like, just as a separate item, they approved the sale to Ironwood.  In my mind, that doesn't mean they are approving the use of the sale to Ironwood and approving the use.  So, they very well may have said I don't want – the example from before, they very well – there's a document we looked at before that said that Lincoln – that said the Mills agreed to allow Ironwood to buy the property.  I don't infer from that statement that they also are allowing us to put Lincoln Tech in the space. They are separate.  So, just because they approved our right to purchase the property doesn't mean they are letting us after we buy it stick Lincoln Tech in there.  All it means is I now own a vacant building I can't put Lincoln Tech in.  So, in that same context here, it – they are the same. They – if they approved the use of a vocational school, to me that means I can have Lincoln Tech occupy the space.

(Id. at 147:1-149:15.)

Q.     Would you buy this property now on – would Ironwood buy this property now, the former Phar-Mor property?

A.     If Lincoln Tech hadn't found a home and if the Mills would agree to it, absolutely.

Q.     How about if not, just as a vacant property?

A.     No.

Q.     At any price?

A.     Probably not, because the document that governs it is so restrictive that I don't know what I would – we would have had concern – frankly, I'm surprised – we may have had this conversation – that if we had done the deal with Lincoln Tech and they closed up and we now own this building, we would have been so limited based on the documentation that if we were able to get them to approve Lincoln Tech, looking back, hopefully, eight years wiser, I should have been concerned about what our exit strategy would be if that tenant ever crapped out.

(Id. at 153:3-21.)

Q.     Okay.  If the operating easement agreements that we have been discussing here, the master declaration and the PMI restrictions were not in place, could Ironwood have closed this deal?

A.     It's hard to say.  My first reaction is absolutely, although I don't think we ever finished our due diligence because we were hung up on those issues. But clearly from the amount of time we spent on it, those were the two most significant items.  Looking at the actual title report, it looks like there's only twelve or so items, which is surprising.  It's hard to affirmatively say that, though.

Q.     But there's nothing else out there that you are aware of that would have been an impediment to the sale, is there?

A.     Not that I'm aware of.

Q.     Is it fair to say that the existence of these instruments is what prevented the sale of this property from Nationwide to Ironwood?

A.     Yes.

(Id. at 157:8-158:4.)

Further, Jennifer Thrasher, of Nationwide, testified that Nationwide's inability to close the deal with Ironwood arose directly from the Declaration of Restrictions's provisions:

> Q.     Would you say Nationwide's failure, or should I say inability to sell or lease the property is in the broad strokes why this lawsuit was brought and the damage it seeks?
>
> A.     Yes.
>
> Q.     And I just want to make sure I understand from your testimony, has that inability been solely on account of what Franklin Mills will or will not permit, or I should say, has or has not permitted?
>
> A.     I know of no other obstacles other than the Franklin Mills restrictions, permissions.

(Thrasher Dep. 31:1-12.)

> Q.     Was the ability of Franklin Mills to say their [Ironwood's] net worth, that purchaser's net worth is not enough, was that the reason any of the sales or leases did not go through?
>
> A.     No.
>
> Q.     Was their exercise of a right to approve what the potential purchaser or lesser was going to use the property for the reason the sale didn't go through?
>
> A.     Yes.
>
> Q.     And is that the only thing that's not caused these sales or leases to go through?
>
> A.     Yes.

(Thrasher Dep. at 43:17-44:5.)

Finally, Plaintiff's expert, Reaves C. Lukens, opined that the property is subject to significant use restrictions, which "severely limit the marketability and adversely impact the value of the property." (Pl.'s Mot. Summ. J., Ex. H.) He reported that "[t]he restrictions in place are extremely onerous" and that he made "an exhaustive, but unsuccessful, search of the market

looking for examples of similarly restricted retail stores which sold or were leased." (Id.)
Further, he was unable "to identify a single potential user for the property that would likely be
deemed acceptable to the Franklin Mills Advisory Council (FMAC)," suggesting that the
property's value is "nominal at best." (Id.)

Commonwealth does not dispute that Nationwide's damages were caused by provisions
in the Declaration of Restrictions, but rather challenges what *type* of restrictions within the
Declaration were the source of Nationwide's damages, as follows:

> Put differently, the only reason Franklin Mills can have for rejecting a potential
> purchaser is if that purchaser does not intend to abide by the use restrictions set
> forth in the Master Declaration and the Declaration of Restrictions. Franklin
> Mills thus does not control <u>who</u> operates a business on the Property, but only what
> that business is, and whether the operation of that business is in accordance with
> the Master Declaration and the Declaration of Restrictions. So, to repeat, the
> problem here (and the source of Nationwide's claimed harm) is that Franklin
> Mills has never been presented with a potential tenant whose proposed use of the
> Property is consistent with the terms of the instrument at issue.

(Def.'s Mem. Supp. Mot. Summ. J. 20; <u>see also</u> <u>id.</u> at 22 ("Only [u]se [r]estrictions [a]re the
[s]ource of Nationwide's [a]lleged [l]osses.").) Commonwealth again asserts that because the
ALTA 9 Endorsement covers only direct restraints on alienation and not use restrictions, Plaintiff
has not suffered any covered loss.

As discussed in detail above, however, this argument offers a distinction without a
difference.[10] The ALTA 9 Endorsement, in this case, clearly covers the entirety of the

---

[10] Plaintiff offers a plethora of evidence demonstrating that it suffered damages not only from the
use restrictions contained within the Declaration of Restrictions, but also from Declaration of
Restrictions's provisions regarding Franklin Mills's right to approve a future purchaser, option to
repurchase, and private assessment. As the Court has found that the ALTA 9 Endorsement
covers any loss or damage arising from the actual Declaration – unless expressly excepted in

Declaration of Restrictions, unless the particular restriction or type of loss was "expressly excepted," as previously defined by the Third Circuit.  Because the Declaration of Restrictions falls within the confines of the ALTA 9 Endorsement, and because the evidence reveals that Nationwide suffered damages sustained by reason of such an instrument, Nationwide is entitled to coverage under the Policy.[11]

C.    **Whether Nationwide "Assumed" or "Agreed to" the Encumbrances at Issue, Thereby Making All Loss or Damage Arising Therefrom Excluded from Coverage**

In an alternate effort to avoid liability to Plaintiff, Defendant argues that even if coverage under the ALTA 9 Endorsement existed, Plaintiff assumed or agreed to the encumbrances contained in the Master Declaration and Declaration of Restrictions at the time it issued the mortgage to PMI.  In turn, Defendant contends that coverage for loss or damage arising from those encumbrances is expressly excluded under Exclusion 3(a) of the Policy.

Under Pennsylvania law, "exceptions to an insurer's general liability are interpreted narrowly against the insurer."  Morrison v. Wells Fargo Bank, N.A., 711 F. Supp. 2d 369, 387 (M.D. Pa. 2010); see also Selko v. Home Ins. Co., 139 F.3d 146, 152, n.3 (3d Cir. 1998) (holding that, under Pennsylvania law, exclusions and ambiguities in the policy are strictly construed against the insurer).  Thus, "[t]he burden of establishing exclusion from coverage rests with the

_____

Schedule B – there is no need to determine the precise source of Nationwide's damages.

[11]  Plaintiff also contends that the Master Declaration falls within the ALTA 9 Endorsement's scope of coverage.  Having already found coverage for Plaintiff's losses sustained as a result of the Declaration of Restrictions, and as any losses from the Master Declaration are identical, the Court does not separately address this document.

insurance company." Bragman v. Commw. Land Title Ins. Co., 421 F. Supp. 99, 103 n.6 (E.D. Pa. 1976) (citing Daburlos v. Commercial Ins. Co. of Newark, N. J., 521 F.2d 18 (3d Cir. 1975)), aff'd, 561 F.2d 493 (3d Cir. 1977); see also West Am. Ins. Co. v. Lindepuu, 128 F. Supp. 2d 220, 227 (E.D. Pa. 2000) ("Exclusions are strictly construed against the insurer."); Ticor Title Ins. Co. of Cal. v. FFCA/IIP, 898 F. Supp. 633, 639 (N.D. Ind. 1995) (holding that insurer has the burden of establishing that Exclusion 3(a) excludes the risk).

Exclusion 3(a) of the Policy at issue provides, in pertinent part, as follows:

The following matters are expressly excluded from the coverage of this policy and [Commonwealth] will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

3.      Defects, liens, encumbrances, adverse claims or other matters: (a) created, suffered, assumed or agreed to by the insured claimant . . .

(Def.'s Mot. Summ. J., Ex. 2 at Bates No. 582.)  The dispute between the parties focuses not on the terms "created" or "suffered," but rather on whether Plaintiff "assumed" or "agreed to" the encumbrances for which it now seeks coverage.  Unfortunately, the meaning of these latter terms has yet to obtain affirmative judicial review within the Third Circuit.  Multiple treatises have wrestled with the scope and meaning of the exclusion and have almost uniformly held that the "assumed" or "agreed to" requires something more than mere negligence.  As discussed in the American Law Reports:

In cases involving a discussion of a clause excepting defects, liens, or encumbrances created, suffered, assumed, or agreed to by the insured, it has been held that the insurer may not escape liability under the clause where the insured was merely negligent in bringing about his own loss or was innocent of any conduct causing the loss. . . . On the other hand, the insurer has been held relieved of any liability by reason of a clause excepting defects, liens, or encumbrances created, suffered, assumed, or agreed to by the insured, where the defect, lien, or

38

encumbrance resulted from the intentional misconduct or inequitable dealings of the insured himself. . . .

Apart from any considerations of misconduct on the part of the insured, the exception clause under discussion herein has also been held applicable to relieve the insurer of any liability in cases where the insured either expressly or impliedly assumed or agreed to various defects, liens, or encumbrances in the course of purchasing the property involved.

87 A.L.R.3d § 515 (2010) (footnotes omitted).

Further, commentary within American Jurisprudence (Second) states:

A title insurance policy which excludes from coverage adverse claims "created, suffered, assumed or agreed to by the insured" requires a conscious, deliberate, or affirmative act to create an adverse claim. . . . *Where the defect, lien, or encumbrance is brought about by some accidental, merely negligent, or innocent conduct of the insured*, not intended to create a cloud on the title, such defect, lien, or encumbrance is *not* considered as having been created, suffered, *assumed, or agreed to* by the insured. . . .

43 AM. JUR. 2D INSURANCE § 530 (2010) (emphasis added).

Despite the dearth of Third Circuit jurisprudence interpreting this exclusion, appellate courts outside the Third Circuit have similarly agreed that "[w]here the defect was caused by mere negligence or by the innocent conduct of the insured, Exclusion 3(a) . . . [is] not generally applicable." Id. As persuasively described by the Sixth Circuit, "an insured does not assume an assessment against property merely because he agreed to take the property 'subject to' any assessments. . . . 'Assume,' under this definition requires knowledge of the specific title defect assumed. . . . And 'agreed to' carries connotations of 'contracted,' requiring full knowledge by the insured of the extent and amount of the claim against the insured's title. As with the other terms, this definition implies some degree of intent." Am. Sav. & Loan Ass'n v. Lawyers Title

Ins. Corp., 793 F.2d 780, 784 (6th Cir. 1986) (some internal citations and quotations omitted).

Similarly, the Eighth Circuit has found that "the insurer can escape liability only if it is established that the defect, lien or encumbrance resulted from some intentional misconduct or inequitable dealings by the insured or the insured either expressly or impliedly assumed or agreed to the defects or encumbrances in the course of purchasing the property involved.  The courts have not permitted the insurer to avoid liability if the insured was innocent of any conduct causing the loss or was simply negligent in bringing about the loss."  Brown v. St. Paul Title Ins. Co., 634 F.2d 1103, 1107 n.8 (8th Cir. 1980).[12]

---

[12]  Many other courts have followed suit.  See, e.g., Chicago Title Ins. Co. v. Resolution Trust Corp., 53 F.3d 899, 905 (8th Cir. 1995) ("This type of exclusion bars coverage where there has been misconduct or inequitable behavior on the part of the lender, where the lender assumes or agrees to liens, or where the lender stands to receive an inequitable windfall if the insurer settles lien claims in order to protect the mortgage priority."); Mercantile-Safe Deposit and Trust Co. v. Chicago Title Ins. Co., No. CIV.A.05-2217, 2007 WL 892103, at *8 (D. Md. Mar. 20, 2007) ("The insurer . . . may not avoid liability based on mere negligence of the insured in bringing about the loss."); Ticor Title Ins. Co. of California v. FFCA/IIP 1988 Prop. Co., 898 F. Supp. 633, 639 (N.D. Ind. 1995) ("[F]or Exclusion 3(a) to apply as an exception to coverage, the insured must have manifested some element of intent to 'create, suffer, assume or agree to' a defect in title."); Sims v. Sperry, 835 P.2d 565, 571 (Colo. App. 1992) ("[W]e have already concluded that 3(a) requires the insured to intend the defect to occur.  Intent implies knowledge of the intended defects by the insured."); Omega Ltd. P'ship v. First Am. Title Ins. Co., No. 111149, 1992 WL 885041, at *1 (Va. Cir. Ct. 1992) ("Here, the defendant argues that the plaintiff constructively agreed to the defect, because it should have known of the defect if the surveyor, acting as plaintiff's agent, properly performed his job.  This is rejected, because the contract language should be strictly construed against the writer of the contract.  Therefore, this exclusion should only apply where the insured specifically agreed to the defect not being covered.  To hold otherwise, would give the insurer a benefit for which he had not bargained.  Here, it is admitted that there was no actual agreement."); Bourland v. Title Ins. Co. of Minn., 627 S.W.2d 567, 571 (Ark. App. 1982) ("The cases uniformly declare that the words 'agreed to' connote 'contracted.'  The evidence properly viewed does not indicate that appellants agreed to the defect in their title but steadfastly denied knowledge of it."); Arizona Title Ins. & Trust Co. v. Smith, 519 P.2d 860, 863 (Ariz. 1974) ("[O]ur policy of construing ambiguities in favor of the insured leads us to require Actual knowledge on the part of the insured as to the Full extent and amount of the assessment before the exclusion would become operative." (capitalization in original)).

Defendant argues that Plaintiff expressly knew of the encumbrances in the Master Declaration and the Declaration of Restrictions, and thus "assumed" those encumbrances within the meaning of Exclusion 3(a).  In particular, Defendant points out that when Nationwide originally made its loan to PMI, taking the subject Property as collateral, it prepared and issued the requisite mortgage documents.  The mortgage contract stated that "Borrower [PMI] covenants and warrants with and to Lender [Nationwide] that . . . the Property is free and clear of all liens and encumbrances of any kind, nature or description, save and except only . . . [for] those matters set forth in Exhibit 'B' attached hereto and made a part hereof (collectively referred to herein as the 'Permitted Exceptions')."  (Def.'s Mot. Summ. J., Ex. 4, 4.)  Exhibit B, which listed the "Permitted Exceptions," thereafter specifically referenced both the Master Declaration and the Declaration of Restrictions with their respective recording numbers.  (Id. at Ex. B.)  Defendant now argues that "[o]nly if Nationwide and its agent did not read any of their own documents relating to the collateral for Nationwide's $3.5 million loan to PMI, or did not look at the Policy it purchased from Commonwealth, could Nationwide not have known of the existence of the Declaration of Restrictions, the Master Declaration, and their relevant provisions.  Nationwide can reasonably make no such claim."  (Def.'s Mem. Supp. Mot. Summ. J. 31-32.)  In turn, Defendant concludes that Nationwide necessarily "assumed or agreed" to such encumbrances for purposes of Exclusion 3(a).  (Id.)

Defendant's argument, however, fails on several grounds.  First, as noted above, "[a]ssume" under Exclusion 3(a) requires "knowledge of the *specific* title defect assumed," while "agreed to" means explicitly contracted with full knowledge by the insured of the extent of the encumbrance.  Am Sav. & Loan Ass'n, 793 F.2d at 784 (emphasis added).  Defendant fails to

41

produce any evidence that Plaintiff had knowledge of the "specific title defect assumed."[13] Indeed, nothing in the record suggests that Plaintiff possessed actual knowledge of the contents of such instruments, that the instruments were ever included as part of the underwriting file, or that the specific encumbrances contained in those documents were ever revealed to Nationwide. Rather, its evidence reflects only that the Master Declaration and the Declaration of Restrictions were listed in the mortgage documents and underwriting file as instruments containing encumbrances on the title. Mere knowledge of the Declaration of Restrictions or Master Declaration as public documents affecting the land does not impute to Nationwide accrued knowledge of the contents of those documents for purposes of the Exclusion.[14] If anything, Plaintiff was simply negligent in failing to read the documents and determine what encumbrances were contained therein, which is clearly "not sufficient to establish a policy exclusion under the terms of 3(a)." Mercantile-Safe Deposit and Trust Co., 2007 WL 892103, at *9.

Second, and perhaps more importantly, Defendant's argument both disregards the very purpose behind Plaintiff's purchase of the title insurance policy and ignores the fundamental underpinnings of the Third Circuit's decision. It is well-established that "[t]itle insurance protects homebuyers and mortgagors against losses arising out of defects in title that existed at the time of the sale or mortgage." In re Pa. Title Ins. Antitrust Litig., No. CIV.A.08-1202, 2010

---

[13] Defendant's Reply Brief in support of its Motion for Summary Judgment quotes Plaintiff's counsel's argument to the Third Circuit for the proposition that he "misled" the Third Circuit as to how much Nationwide knew. (Def.'s Reply Br. Supp. Mot. Summ. J. 14 n.13.) Nothing in this footnote supports such an argument.

[14] Notably, the Policy itself defines "knowledge" as "actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land." (Def.'s Mot. Summ. J., Ex. 4, at § 1(c).)

WL 4974942, at *2 (E.D. Pa. Nov. 30, 2010). "Before a title insurer issues a policy, a title insurance agent, independent attorney, or employee of the title insurance company must search and examine public records in order to identify any potential defects, such as liens or encumbrances." Id. (citing 40 Pa. Cons. Stat. § 910-7). As a result, "the title insurer's function is primarily to prevent losses by reducing the insured's ignorance of the state of title to the lowest possible level, and only secondarily to pay losses when some element of ignorance has not been eliminated by the title search and examination." Id. (internal quotations omitted).

In its previous opinion in this case, the Third Circuit expressly addressed who bore the burden of detecting title restrictions and encumbrances contained in a publicly recorded document. It recognized that "[s]ince the first land title insurance company opened in 1876, '[o]ne of the big talking points for title insurance is that it relives the investor from title work, examinations and worry therefrom, as well as affording protection.'" Nationwide, 579 F.3d at 318 (citation omitted). When Nationwide paid Commonwealth to review its interest in the title to the Property, it "discharged its 'burden of completing proper diligence' to the extent that Commonwealth did not expressly except such restrictions from coverage in Schedule B of the policy." Id. at 319. It further noted that "Commonwealth bore the burden of detecting the restrictions stated in the Declaration, and had to list those restrictions explicitly as exceptions to avoid covering loss for them." Id.

To now accept Defendant's argument regarding the application of Exclusion 3(a) would effectively turn these principles on their head. Although the mortgage documents and underwriting file between Nationwide and PMI identified the Declaration of Restrictions and the Master Declaration, they did not specify what types of liens, encumbrances, and title defects were

43

contained in those instruments. To that end, and *simultaneously* with the issuance of the mortgage, Nationwide hired Commonwealth: (1) to review the title of the Property, including the public records identified in the mortgage documents; (2) to notify Nationwide of any specific encumbrances on the property; and (3) if it chose not to insure those encumbrances, to expressly except them on Schedule B. In other words, Nationwide placed substantial reliance on Commonwealth's professed ability to reveal defects in the title. To the extent Commonwealth failed to expressly except the specific encumbrances found in such documents, the Third Circuit determined that it was liable for any loss sustained as a result of them. Allowing Commonwealth to invoke Exclusion 3(a) of the Policy at this juncture would end-run those dictates and re-shift the burden back to Nationwide to comb through public records, read, and interpret the precise impact of the documents. To quote from the Third Circuit, it "surpasses strange" to think that Nationwide would pay an extra premium for an ALTA 9 Endorsement to cover an instrument, that will nonetheless be excluded by the Policy on the grounds that it was mentioned in the underwriting file for Nationwide's mortgage to PMI – the very transaction Commonwealth was hired to review.[15] Id. at 313.

---

[15] None of the cases that Commonwealth cites support its argument that Exclusion 3(a) applies. See Lawyers Title Ins. Corp. v. Research Loan & Inv. Corp., 361 F.2d 764, 767-69 (8th Cir. 1966) (noting that although there was no evidence of plaintiff's actual knowledge of defect, court found that plaintiff had assumed defects by taking a deed without applying for title insurance before the closure of the deal; had plaintiff "applied for the insurance prior to closing the deal . . . it would be reasonable to conclude that [plaintiff] was relying on the title insurer to advise it of the true state of the record title and intended to assume, in the context of the policy condition, only those obligations which the title search revealed."); Nat'l Credit Union Admin v. Ticor Title Ins. Co., 873 F. Supp. 718, 726-27 (D. Mass. 1995) (finding that knowledge of three senior officers who intentionally created and agreed to a second mortgage position was imputed to the company at the time it got its second title policy, thereby implicitly acknowledging that actual knowledge is necessary for Exception 3(a) to apply); First Nat. Bank of Minneapolis v. Fidelity Nat'l Title Ins. Co., 425 F. Supp. 105, 112 (D. Neb. 1977) (reversed by Eighth Circuit, 572 F.2d

44

In short, the Court finds that Exclusion 3(a) does not apply in this case.[16] Defendant has produced no evidence – let alone evidence sufficient to create a genuine issue of material fact – that Plaintiff had actual knowledge of the specific title defects on the Property when it gave the mortgage to PMI. Absent actual knowledge, Plaintiff cannot be deemed to have "assumed" or "agreed to" such encumbrances.

### D.    Damages Available to Plaintiff

_____Having thus found that Plaintiff is unequivocally entitled to coverage under the Policy, the Court must now determine whether summary judgment is appropriate on the precise amount of damages owed to Plaintiff. Four categories of damages are at issue: (1) Nationwide's

---

155, 162-63 (8th Cir. 1978), which held that insured's knowledge that prior encumbrances existed "will not absolve the insurer from liability for them unless the insurer also establishes by a preponderance of the evidence that the [insured] agreed that its mortgage would occupy a secondary position to the purchase money mortgages"); First Am. Title Ins. Co. v. Kessler, 452 So.2d 35, 39-40 (Fl. Dist. Ct. App. 1984) (finding genuine issue as to whether insured knew enough about defect in title as to "assume" or "agree to" that defect for purposes of the exclusion); Cohen v. Sec. Title and Guar. Co., 562 A.2d 510, 512 (Conn. 1989) (finding, in case where plaintiffs discovered that the legal description contained in the contract of sale and proposed deed included more property than plaintiffs had intended to buy and the sellers had intended to sell and where plaintiffs knew about discrepancy in legal description, that plaintiffs had suffered no loss since they received exactly what they paid for and that, in any event, plaintiff acquiesced to discrepancy in legal description by not bringing it to the attention of the seller; thus they were deemed to have "agreed to receive a defective deed."); Buffington v. Atlanta Title & Trust Co., 159 S.E. 297, 297 (Ga. Ct. App. 1931) (not discussing Exclusion 3(a)); Smith v. Lawyers Title Ins. Corp., 76 Pa. D.&C. 88, 91-92 (1949) (finding that insured had "created" the defect in title from which it suffered loss; no discussion of terms "assumed" or "agreed to").

[16] Plaintiff also makes an argument of statutory interpretation, arguing that Exclusion 3(b) presupposes that an insured's knowledge of a recorded defect is not sufficient to exclude coverage. In light of our finding that Exclusion 3(a) does not apply, the Court need not address this argument.

maximum potential recovery at trial under the Policy; (2) pre-judgment interest; (3)

consequential damages; and (4) CAM charges.  The Court takes each category separately.

### 1. Limits on Policy Damages

The Policy's "DETERMINATION AND EXTENT OF LIABILITY" section provides as

follows:

>This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only in the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of

    (i) the Amount of Insurance stated in Schedule A or, if applicable, the amount of insurance as defined in Section 2(c) of these Conditions and Stipulations.

    (ii) the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

    (iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c) The Company will pay only those costs, attorney's fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

(Def.'s Mot. Summ. J., Ex. 2 at Conditions and Stipulations § 7.)[17]

Citing to this provision, Commonwealth argues that its "Extent of Liability" is limited to the least of: (a) the amount of insurance stated in Schedule A – which is $3.5 million;[18] (b) the amount of the unpaid principal indebtedness secured by the insured mortgage, which the parties appear to agree is $3,132,748.75; or (c) the difference between the value of the Property as insured and the value of the Property subject to the various encumbrances upon that Property. With respect to this latest measure of damages, Commonwealth references the report of Nationwide's expert, Reaves Lukens, who estimated that the Property, as of September 17, 2010, was worth $2,250,000 as unencumbered and was of nominal value with the restrictions. (Def.'s Mot. Summ. J., Ex. 17 at 2.) As the difference between these two values – $2,250,000 – is the least of the three measures of damages, it purportedly constitutes the limitation on the extent of Commonwealth's Policy liability.[19]

---

[17] In its Motion for Summary Judgment, Plaintiff originally cites to paragraph 2(c) of the Policy for purposes of establishing its maximum potential recovery. This provision, however, deals only with the continuation of insurance in the event that Plaintiff takes title to the subject Property and dictates what the maximum amount of insurance would be. (Def.'s Mot. Summ. J., Ex. 2, ¶ 2(c).) Paragraph 7 explicitly sets forth limitations on Defendant's liability in the event of title damages and, as such, is the proper paragraph to consider on this issue. (Id. ¶ 7.) Plaintiff appears to concede as much in its Response to Defendant's Motion for Summary Judgment.

[18] Neither party contemplates or discusses the fact that the "amount of insurance" may have changed upon Nationwide's taking title to the Property pursuant to paragraph 2(a) and (c) of the Policy. As set forth in footnote 17, supra, paragraph 2(c) provides an alternate calculation for the "amount of insurance" after the insured acquires the property by "conveyance in lieu of foreclosure." (Def.'s Mot. Summ. J., Ex. 2, ¶¶ 2(a), (c).)

[19] Notably, Commonwealth does not agree with Lukens's 2010 appraisal. Rather, based on its own expert appraiser, John Doyle, it concludes that there is no difference between the value of the Property with and without the subject encumbrances. (Def.'s Mem. Supp. Mot. Summ. J. 36 n.30 & Ex. 18.) Commonwealth concedes, however, and this Court agrees, that "this is not a dispute the Court could or should resolve at summary judgment." (Id. at 36 n.30.)

In response, Nationwide suggests multiple different calculations for the proper amount of Policy damages. In its Motion for Summary Judgment, Nationwide contends that Commonwealth "is liable for at least the full amount of the policy proceeds, $3,500,000, due to damages caused by the Master Declaration and by the Declaration of Restrictions in preventing the sale to Ironwood and in rendering the Property worthless." (Pl.'s Mem. Supp. Mot. Summ. J. 17.) Subsequently, in its Response to Nationwide's Motion for Summary Judgment, Plaintiff argues that "'[d]amages for breach of contract are to be determined as of the time of the occurrence of the breach.'" (Pl.'s Resp. Def.'s Mot. Summ. J. 25 (citing Edwards v. Wyatt, 330 Fed. Appx. 342, 351 (3d Cir. 2009) (quoting 22 AM. JUR.2D Damages § 78 (2008))).) It reasons that, although its own expert opines that the current value of the Property, without restrictions is $2.25 million, that appraisal is inapplicable because it does not represent the value of the Property at the time of the breach, but rather is reflective of "the worst economic downturn since the Great Depression." (Id. at 25.) It concludes that because, at the time of the breach, a willing buyer, *i.e.* Ironwood, would have paid $3.8 million in an arms length transaction and the value of the encumbered property was zero due to it inability to be sold, Nationwide's insured losses are at least $3,800,000. (Id. at 26.)

---

As a side note, Plaintiff contends that the Doyle report is inadmissible because Plaintiff did not receive a copy of it until Commonwealth filed its Motion for Summary Judgment on October 18, 2010, which was well after the deadline for the exchange of expert reports. As explained by Defendant, however, Doyle's report was a rebuttal to Nationwide's 2010 appraisal report, which Nationwide did not provide to Commonwealth until September 24, 2010. Because Commonwealth sent the Doyle report to Plaintiff's counsel seven days after receipt of the 2010 appraisal by Lukens, it is, under Fed. R. Civ. P. 26(a)(2)(D)(ii), timely and not excludable.

48

Under the summary judgment standard of Fed. R. Civ. P. 56, the Court simply cannot, given the parties' conflicting evidence, make any determination as to the maximum recovery amount at this time. Commonwealth, the party moving for summary judgment on the limitation of damages question, has failed to establish the absence of a factual issue regarding the correct value of the Property, particularly since it offers no evidence of valuation at the time of the breach.[20] By the same token, Nationwide, while demanding $3,800,000 in Policy damages based solely on what Ironwood would have paid for the Property, fails to explain why none of the other measures of damages set forth in paragraph 7(a) of the Policy – the least of which sets the extent of liability – should apply. Given the lack of clarity in the parties' briefing and evidence, the Court declines to impose any limitation on or fixation of Policy damages at this juncture.

## 2.  **Prejudgment Interest**

As an additional part of its damages claim, Plaintiff seeks pre-judgment interest. Although Commonwealth does not dispute Nationwide's entitlement to such interest in the event it prevails, Commonwealth argues that that interest award should be limited. It reasons that from roughly June 2006 through February 2008, Nationwide's appeal of this case was stayed before the Third Circuit, at Nationwide's request, while Nationwide pressed its suit against Franklin Mills. Only after Nationwide settled that suit was the stay lifted, leaving the appeal to proceed. Commonwealth now avers that it should not be held liable for any potential pre-judgment interest

---

[20] The Court notes that Plaintiff's expert, Mr. Lukens, originally estimated that, as of 2005, the Property was worth $750,000 as encumbered by the Declaration of Restrictions and $3,000,0000 as unencumbered. (Def.'s Reply Br. Supp. Mot. Summ. J. 16 & Ex. 1.) The difference between these two values would be $2,250,000 and, thus, the least of the damages possibilities under the Policy ¶ 7(a)(iii). Both parties fail to discuss these figures and neither party explains why this valuation should not apply. Nonetheless, the Court leaves this issue for jury resolution.

for the twenty-month period of stay requested by Nationwide. Nationwide, however, denies unilaterally making the request for the stay, but rather contends that both parties agreed to the stay at the request of the mediator.

Again, the Court cannot resolve this issue on summary judgment. Issues of fact remain as to who requested the stay, what the terms of the stay were, and how much of the delay was occasioned by Plaintiff's individual actions. See Nat'l R.R. Passenger Corp. v. New Castle County, 636 F. Supp. 1482, 1487 (D. Del. 1986) ("[W]hen the plaintiff or claimant is solely responsible for delaying in bringing the litigation to fruition, courts have reduced or denied prejudgment interest."). Accordingly, the Court declines to consider the amount of pre-judgment interest at this time.

### 3. Consequential Damages

As a third element of damages, Nationwide also seeks judgment in the amount of $1,436,575.14 to compensate it for losses "flowing from" Commonwealth's breach. Such damages include both the lost profits from its thwarted sale to Ironwood in the amount of $300,000,[21] as well as management fees, marketing costs, taxes, repairs, insurance, utilities, common area maintenance charges, and capital expenditures. Defendant responds with three separate arguments. First, it contends that consequential damages are not recoverable as a matter of law in an insurance action where there is no finding that the insurer acted in bad faith. Second, it asserts that none of the extra-contractual amounts sought by Nationwide are amounts

---

[21] Plaintiff explains that the original loan to PMI, and thus the amount of Policy coverage, was $3,500,000, but that it could have sold the property to Ironwood for $3,800,000. Accordingly, it suffered a lost profit in the amount of $300,000.

that were known, foreseeable, or reasonably flowed from Commonwealth's alleged breach of contract. Finally, it claims that the Policy itself forecloses recovery of compensatory, *i.e.* consequential, damages.

> **a.**     **Whether Consequential Damages Are Recoverable As a Matter of Law**

Defendant first argues that an insured such as Nationwide, cannot, as a matter of law, recover consequential damages for breach of an insurance policy where there is no showing that the insurer acted in bad faith. As there has been no such finding in this case, Defendant argues that any claims for consequential damages must be excluded.

Although the Third Circuit has yet to clearly decide this issue,[22] several other state and federal courts within this Circuit have implicitly recognized that consequential damages for breach of an insurance contract are only available where there has been evidence of bad faith on the part of the insurer. See, e.g., Amitia v. Nationwide Mut. Ins. Co., No. CIV.A.08-335, 2009 WL 111578, at *4 (M.D. Pa. Jan. 15, 2009) ("[C]ompensatory damages are not recoverable under the bad faith statute *per se*. They are available to anyone who establishes bad faith, because such bad faith is also a breach of the underlying contract for which the compensatory damages are

---

[22] Defendant cites to Sicalides v. Hartford Cas. Ins. Co., 94 Fed. App'x 882, 883 (3d Cir. 2004) for the proposition that "[i]n order to recover consequential damages for breach of an insurance contract, there must be some bad faith conduct on the part of the insurance company." When making this statement, however, the Third Circuit was merely quoting what the District Court had held. Because the Third Circuit decided the appeal on the basis of collateral estoppel only, it expressly noted that it "*need not resolve* the question whether the District Court was correct in concluding that consequential damages are only recoverable if an insurer has breached the contract in bad faith." Id. (emphasis added).

proper."); <u>Henderson v. Nationwide Mut. Ins. Co.</u>, 169 F. Supp. 2d 365, 368 (E.D. Pa. 2001) ("If Plaintiff proves [that defendant insurer acted in bad faith], he may be entitled to compensatory and/or consequential damages."); <u>Birth Center v. St. Paul Cos., Inc.</u>, 787 A.2d 376, 389 (Pa. 2001) (holding that in a bad faith breach of insurance contract claim, an insured may recover traditional contract damages, including consequential damages); <u>Corch Constr. Co. v. Assurance Co. of Am.</u>, 64 Pa. D. & C.4th 496, 518 (2003) ("Where an insurer acts in bad faith, the insured is entitled to recover such damages sufficient to return it to the position it would have been in but for the breach.").[23]

Given this jurisprudence, the Court agrees that, in order for Plaintiff to recover consequential damages from Defendant, it must establish that Defendant acted in bad faith. As set forth in detail below,[24] however, a genuine issue of material fact remains on the question of Commonwealth's bad faith. Therefore, although such consequential damages are available in the event of a showing of bad faith, final resolution of their recoverability in this case must rest with the trier of fact.

        **b.**      **<u>Whether the Claimed Consequential Damages Were Reasonably Foreseeable</u>**

---

[23] Clearly, consequential damages are available for a statutory claim of bad faith under 42 Pa.C.S. § 8371. Although an insurer may not recover such damages based on section 8371, that section "'does not alter [the insured's] common law contract rights.'" <u>Ash v. Cont'l Ins. Co.</u>, 932 A.2d 877, 884 (Pa. 2007) (citing <u>BirthCenter</u>, 787 A.2d at 376). Thus, "'where an insurer acts in bad faith, by unreasonably refusing to settle a claim, it breaches its *contractual* duty to act in good faith and its fiduciary duty to its insured.'"

[24] <u>See</u> <u>infra</u> § III.E

"[C]onsequential damages are those damages that naturally and proximately flow from the breach or that were foreseeable at the time of contract formation." Mextel, Inc. v. Air-Shields, Inc., No. CIV.A.01-7308, 2005 WL 226112, at *35 (E.D. Pa. Jan. 31, 2005). "To prove consequential damages from breach of contract, plaintiff must establish that '(1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.'" Nationwide Mut. Ins. Co. v. CPB Int'l, Inc., 562 F.3d 591, 597 (3d Cir. 2009) (quoting Ferrer v. Trustees of Univ. of Pa., 825 A.2d 591, 610 (Pa. 2002)). In other words, "[f]oreseeability is a key element in the recovery of consequential damages." Altronics of Bethlehem, Inc. v. Repco, Inc., No. CIV.A.89-4918, 1991 WL 133518, at *12 (E.D. Pa. July 15, 1991).

Defendant argues that none of the extra-contractual amounts sought by Nationwide are amounts that were known, foreseeable, or reasonably flowed from Commonwealth's alleged breach of contract. For example, it notes that Nationwide's claimed lost profits arose before Nationwide made a policy demand and, thus, could not have been a consequence of any alleged breach of contract by Commonwealth. Further, the remaining expenses sought by Nationwide such as taxes, CAM charges, and the cost of pursuing a tax-appeal are owner-related expenses which do not flow from any alleged failure on Commonwealth's part to compensate Nationwide under the policy, but rather from Nationwide's pre-claim decision to take title by deed in lieu of foreclosure.

Plaintiff, in response, argues that had Commonwealth properly and timely disclosed the defects at issue in this case, Nationwide could have avoided all damages by refusing to initially

make the loan. Moreover, according to Plaintiff, had Commonwealth indemnified Nationwide when Nationwide made its claim, Nationwide could have simply tendered the Property to Franklin Mills and avoided all future obligation for taxes and CAM charges.

In support of their respective positions, neither party engages in extensive legal analysis, case citation, or presentation of evidentiary support. Given this general lack of briefing, the Court must find that a genuine issue of material fact exists as to whether the claimed damages were such as would naturally and ordinarily result from the breach, or were reasonably foreseeable and within the contemplation of the parties at the time they made the contract.

### c. Whether the Policy Forecloses Recovery of Consequential Damages

In its last general argument against consequential damages, Commonwealth contends that paragraph 7 of the Policy – previously cited at length – contains an explicit limitation of coverage for costs, attorneys' fees, and expenses. According to Commonwealth, such a provision forecloses recovery of any consequential costs or expenses incurred by the insured.

Defendant's interpretation of this provision stands on tenuous grounds. Primarily, nothing within the Policy expressly excludes or limits consequential damages. Moreover, and more importantly, paragraph 7 refers only to limits of available "policy" coverage. The consequential damages that Plaintiff now seeks, however, are based, not on policy coverage, but on Defendant's alleged bad faith breach of contract. In Pennsylvania, a duty of good faith and fair dealing is implied in an insurance contract. Smith v. Lincoln Ben. Life Co., No. CIV.A.08-1324, 2009 WL 789900, at *11 (W.D. Pa. Mar. 23, 2009). To that end, under Pennsylvania law, a plaintiff may bring a cause of action for breach of the contractual duty of good faith and fair

dealing in the insurance context, permitting an insured to recover compensatory, *i.e.* consequential, damages for an insurer's failure to act in good faith. Id. Accordingly, the Court rejects this portion of Defendant's argument.[25]


### 4. CAM Charges

In its final element of damages, Nationwide requests reimbursement of the CAM charges it has paid since taking title to the Property. As noted above, the Declaration of Restrictions encumbering the Property at issue required PMI to pay to Franklin Mills annual assessments for the purpose of maintaining the common areas. (Def.'s Mot. Summ. J., Ex. 6, 13-15.) The Declaration of Restrictions provided that no sale or transfer relieved the owner of the Property from liability for any Annual Assessments. (Id. at 13-14.) Defendant now contends that: (1) Nationwide assumed or agreed to the obligation to pay CAM charges since it only became obligated on such assessments after electing to take title to the Property by deed in lieu of foreclosure[26] and (2) CAM charges are not clouds on title that constitute insurable damages or losses for which Commonwealth is liable under the Policy.[27]

---

[25] Plaintiff presents evidence regarding the specific amounts of its consequential damages. As the Court leaves open the question of whether Commonwealth acted in bad faith, it is not yet clear whether Nationwide is entitled to any such damages. In the event a finding of bad faith is made at trial, evidence of the amount of consequential damages may be presented at that time.

[26] See Thrasher Dep. 65:23-66:6 (noting that Nationwide only paid CAM charges after it took title to the Property).

[27] Notably, Plaintiff's legal basis for seeking reimbursement of CAM charges is – much to the frustration of this Court – unclear. In both its Amended Complaint and its Response to Defendant's Motion for Summary Judgment, Plaintiff classified its request for CAM charges as insurable Policy losses. (Am. Compl. ¶ 49-53; Pl's Resp. Def.'s Mot. Summ. J. 22-24.) In its

With respect to the Defendant's first argument, it asserts that CAM charges are excluded under Exclusion 3(a) of the Policy since Nationwide assumed or agreed to the obligation to pay CAM charges by taking title to the Property by deed in lieu of foreclosure. For the same reasons set forth above, however, the Court must again disagree. As with the other encumbrances on the Property, there is no evidence that, when Nationwide either provided the mortgage to PMI or took title by deed in lieu, it knew about the specific title defects, in particular Franklin Mills's right to charge a private assessment. Although Nationwide did not suffer any damages or loss due to these CAM assessments until after it took the Property from PMI, it is undisputed that the charges pre-existed the Title Policy's effective the date. The duty thus fell on Commonwealth to identify the existence of these particular charges and then expressly except out coverage for them in the event that Nationwide took over the Property.

Defendant alternatively asserts that, under Pennsylvania law, "[t]he sole object of title insurance is to cover possibilities of loss through defects that may cloud or invalidate titles." Rood v. Commw. Land Title Ins. Co., 936 A.2d 488, 492 (Pa. Super. Ct. 2007) (quoting Foehrenbach v. German-Am. Title & Trust Co., 66 A. 561, 563 (Pa. 1907)). It avers that unlike an encumbrance, lien, or easement, the CAM charges for which Nationwide seeks recovery neither diminish the value of the insured property nor affect the validity of Nationwide's title to

---

Memorandum in Support of its Motion for Summary Judgment, however, Plaintiff requested CAM charges as foreseeable compensatory damages over the Policy face amount. (Pl.'s Mem. Supp. Mot. Summ. J. 18.) To the extent Plaintiff seeks CAM charges as only consequential damages, Defendant's arguments are irrelevant. Each of its contentions go only to what was covered under the Policy and not what damages are recoverable as foreseeable losses for Defendant's bad faith breach of contract.

the Property.  Because the CAM charges do not cloud title to the Property, they are not insurable "damage or loss" for which Commonwealth is liable under the Policy.

This argument gives the Court somewhat more pause.  "A defect in ownership or title is said to exist when the aggregate of rights, privileges, and powers known as ownership is subject to the claims of others."  <u>U.S. v. City of Flint, Gensesee County, State of Mich.</u>, 346 F. Supp. 1282, 1284 (D. Mich. 1972) (quoting "Title Insurance: Duty To Search," 71 YALE L.J. 1161 (1962)).  "Barring explicit exclusion in the title insurance policy, such policies generally have been held to include coverage for assessments existing at the time that the insurance is issued, but not to cover assessments which are rendered after that time, even though the right to levy the assessment existed at the time of the insurance."  11 COUCH ON INSURANCE § 159:36 (3d ed. 2010).  Thus, "a policy insuring against 'loss or damage' by reason of defective title or encumbrance covers loss to the insured from the payment of an assessment against the property which constituted a lien at the time the insurance was taken, if not expressly excepted, although the insured had, in his or her contract of purchase, agreed to pay the assessment, and had knowledge of the existence of the lien."  <u>Id.</u>

The language of the documents at issue in this case fail to provide the Court with enough information to grant summary judgment to either party on the request for CAM charges.  The Declaration of Restrictions, which existed at the time the Title Policy was issued, clearly indicated that the CAM charges, "shall be charges *and continuing liens* upon the Property, binding upon Buyer and all successors in title to the Property.  The *liens of the Annual Assessments* [CAM charge] provided for herein shall be subordinate to the lien of any first mortgage or deed of trust upon the Property . . . ."  (Def.'s Mot. Summ. J., Ex. 6, at 14 (emphasis

added).)  Crucially, however, the Declaration of Restrictions goes on to state that "[s]ale or

transfer of the Property shall not affect the Annual Assessments liens; provided, however, that

after the period of redemption has expired after the sale or transfer of the Property *pursuant to a*

*foreclosure* of any first deed of trust or mortgage by any bank, savings and loan association,

insurance company or other institutional lender, the liens of the Annual Assessments *shall be*

*extinguished* (but not the obligation to pay the same) as to payments which became due prior to

such sale."  (Id. (emphasis added).)  The plain language of the Title Policy at issue thereafter

explicitly excludes from coverage any liens "attaching or created subsequent to Date of Policy,"

such as a lien for non-payment of CAM charges.  (Def.'s Mot. Summ. J., Ex. 2, at Exclusion

3(d).)

     Despite these obviously relevant provisions, neither party even references the

aforementioned language within the Declaration of Restrictions,[28] let alone provides any

guidance as to what was intended by its inclusion.[29]  Moreover, neither party provides any

discussion of what the "period of redemption is" or whether Nationwide's taking of the Property

by deed instead of foreclosing on the Property, "extinguished" the "liens of Annual

---

[28]  Notably, Defendant's argument on this point consists of only two short paragraphs with no on-point case citation.  Plaintiff's responsive argument fares no better, consisting of one short paragraph with no case citation.

[29]  In an effort to argue that the Policy specifically insured against such CAM charges, Plaintiff references the ALTA 9 Endorsement's statement that Commonwealth insures Nationwide against loss or damage sustained by reason of "[a]ny instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land which, in addition . . . provides for a private charge or assessment."  (Def.'s Mot. Summ. J., Ex. 2, ALTA 9 Endorsement § 1(b)(2)(iii).)  As set forth earlier in this opinion, however, this provision only insures against loss from "any instrument" that contained private charges or assessments, not against such assessments themselves.  To hold otherwise would contradict the earlier interpretation of this provision.

58

Assessments."  Finally, neither party sets forth the basic facts surrounding Plaintiff's obligation for and payment of the CAM charges for which it seeks recovery, including whether a lien for CAM charges existed at the time it took title to the Property or whether its request for CAM charges consists only of payments made to sustain its ownership of the Property.

In sum, to the extent Plaintiff seeks CAM charges as insurable policy losses, genuine issues of material fact preclude a grant of summary judgment on this issue.  Given the cursory arguments of this issue by both parties, the Court lacks sufficient guidance to determine whether or not the CAM charges fell within the scope of Policy.  Accordingly, the Court denies this portion of both Motions for Summary Judgment.[30]

### E.  Whether Nationwide's Claim for Bad Faith Should Be Dismissed

Finally, the parties dispute whether Nationwide should be held liable for bad faith breach of contract under 42 Pa.C.S. § 8371.  Plaintiff seeks a judgment from this Court that Defendant clearly acted in bad faith, while Defendant contends that this claim must be dismissed for lack of evidence.

The Pennsylvania bad faith statute states:

§ 8371. Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

---

[30]  Defendant also contends that Nationwide's claim for real estate taxes is also specifically excluded under the Policy and does not constitute an insurable claim.  Nationwide, however, expressly concedes that it is not seeking real estate taxes as insurable losses covered by the Title Policy, but rather is claiming them as foreseeable consequential damages stemming from Commonwealth's breach of the title insurance contract.

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. § 8371. Section 8371 does not define "bad faith." In the context of insurance litigation, however, Pennsylvania courts have universally accepted the following definition:

> 'Bad faith' on the part of the insurer is any frivolous or unfounded refusal to pay proceeds of policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; *mere negligence or bad judgment is not bad faith.*

Adamski v. Allstate Ins. Co., 738 A.2d 1033, 1036 (Pa. Super. Ct. 1991) (quoting Black's Law Dictionary 139 (9th ed. 1990)) (emphasis added). Thus, to establish bad faith under the statute, the Superior Court has set forth a two-part test, both parts of which must be established by clear and convincing evidence: "(1) the insurer lacked a reasonable basis for denying coverage; and (2) the insurer knew or recklessly disregarded its lack of a reasonable basis." Id. (citing Terletsky v. Prudential Prop. and Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)); see also Nw. Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005). Under Pennsylvania law, the presence or absence of bad faith does not depend on the legal correctness of the basis for an insurer's denial of an insured's claim. Jung v. Nationwide Mut. Fire Ins. Co., 949 F. Supp. 353, 359-60 n.7 (E.D. Pa. 1997). "If it did, the need for an independent analysis of an insured's bad faith claim would disappear, as the applicable section 8371 claim would turn specifically on the underlying coverage determination." Employers Mut. Cas. Co. v. Loos, 476 F. Supp. 2d 478,

496 (W.D. Pa. 2007).  The Third Circuit has thus held that, "[a] reasonable basis is all that is required to defeat a claim of bad faith."  J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d Cir. 2004).  "[Q]uestionable conduct giving the appearance of bad faith is not sufficient to establish a bad faith refusal to provide coverage if the insurer had a reasonable basis for denying the claim."  Post v. St. Paul Travelers Ins. Co., 609 F. Supp. 2d 382, 385 (E.D. Pa. 2009).

The Third Circuit, in J.C. Penney Life Ins. Co. v. Pilosi, expanded on the "clear and convincing" standard and found that it "requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'"  J.C. Penney, 393 F.3d at 367 (quoting Bostick v. ITT Hartford Group, Inc., 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999)).  As a result, it remarked that "the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial."  Id. (citing Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999).  In that case, the defendant insurer had engaged in some conduct that "may have created the appearance of bad faith."  Id. at 367.  For example, although its marketing material claimed that coverage applied broadly to certain items, company officials testified that these statements were either "probably false" or "not necessarily totally true."  Id.  In addition, the defendant insurer took inconsistent positions in different cases on whether the individual requirements of the policy were satisfied.  Id.  Nonetheless, the Third Circuit found "insufficient evidence from which a jury reasonably could conclude that it was unreasonable for [the insurer] to deny the [plaintiff's claim]."  Id. at 367-68.  It reiterated that "a reasonable basis [to deny coverage] defeats a claim of bad faith."  Id. at 368.

Applying the same clear and convincing standard to the present case, the Court declines to grant summary judgment in favor of either party. Plaintiff argues that when Commonwealth initially denied coverage to Nationwide, it relied on the same interpretation of the ALTA 9 Endorsement that it later asserted before this Court. The Court of Appeals found this interpretation incorrect and inconsistent with the one reasonable interpretation of the Policy. Further, Plaintiff contends that Commonwealth knew or recklessly disregarded its lack of a reasonable basis to deny Nationwide's claim by deviating from its own guidelines and communications of underwriting guidance to agents as to the meaning of the term "expressly excepted."

Defendant responds that the Third Circuit never held, as a matter of law, that the defense interpretation of the policy was unreasonable, only that it was incorrect. Moreover, according to Defendant, the undisputed facts of record demonstrate no bad faith by Commonwealth in connection with the handling of the subject claim. No discovery took place in this case prior to remand by the Third Circuit, no court had previously addressed the meaning of the language in the ALTA 9 Endorsement before this case, and no evidence exists showing that Commonwealth had ever before handled an ALTA 9, § 1(b)(2) claim prior to this suit.

Upon review of the record before the Court, only three facts are certain. First, this Court initially agreed with Defendant that Nationwide's claim was expressly excepted from coverage and so held in the opinion on the Motion to Dismiss. Second, when the Court of Appeals took on this novel issue of law – one not yet addressed by other courts – it did not find, as a matter of law, that Commonwealth's or this Court's interpretation was unreasonable, only that the interpretation was in error in light of the text, purpose, and industry usage of the ALTA 9

Endorsement. Third, since returning to this Court, the parties have, for the first time, engaged in substantial discovery. Some of the newfound evidence obtained by such discovery suggests, but far from conclusively establishes, that Commonwealth may have recklessly disregarded a known lack of a reasonable basis and continued to deny coverage. In light of competing proofs as to the existence of guidelines unequivocally interpreting the scope of the ALTA 9 Endorsement, this Court cannot find either clear and convincing evidence of Commonwealth's bad faith or a blatant absence of any evidence of bad faith on Commonwealth's part. Accordingly, the Court foregoes a summary judgment ruling this issue of bad faith.

## IV.     CONCLUSION

Based upon the foregoing, the Court now finds that summary judgment is proper only in part. Combining the holding of the Third Circuit in this matter with our own interpretation of the Policy language at issue, the Court finds no question that the Policy issued by Commonwealth to Nationwide covers – without exclusion – the loss suffered by Nationwide as a result of its inability to sell the subject Property, together with appropriate prejudgment interest. While Defendant has spun some creative arguments regarding the appropriate policy interpretation, both the spirit of the appellate court's opinion and a plain language reading of the ALTA 9 Endorsement require this Court to find in favor of broader coverage. Nonetheless, as to the proper amount of damages available under the Policy, the Court holds that the multitude of issues of material fact preclude any precise determination at the summary judgment level. Indeed, the parties implicitly recognize as much in light of their scant briefing and evidentiary submissions

on these issues.  In addition, because the issue of Commonwealth's bad faith remains an unresolved issue of fact requiring resolution by a jury, the Court declines to rule on the availability and amount of claimed consequential damages.

Therefore, the Court enters judgment in favor of Nationwide on its claim of breach of contract (Count I), and enters a declaratory judgment in favor of Nationwide on its claim that the ALTA 9 Endorsement affords some coverage for Nationwide's losses suffered as a result of Franklin Mills's refusal to approve Ironwood as a purchaser of the Property  (Count IV in part). We decline, however, to decide as a matter of law whether Nationwide is entitled to recovery on its breach of contract claim for refusal to insure losses due to CAM charges (Count II), whether Nationwide can prevail on its bad faith claim (Count III), or what amount of damages is owed to Nationwide.  An appropriate order follows: